KANNE, Circuit Judge.
 

 When Dr. Douglas R. Prince and his wife, Jane Prince, filed for bankruptcy reorganization in 1981, Dr. Prince operated his orthodontics practice as a wholly owned professional corporation. As part of the plan of reorganization, Dr. Prince was to retain his practice, but the Princes agreed to pay the equity value of his stock in the professional corporation into a fund to satisfy their unsecured creditors. When the Princes and the unsecured creditors committee could not agree upon the stock’s worth, they turned to the bankruptcy court for a valuation hearing. The bankruptcy court determined that the stock was worth only the value of the practice’s physical assets, but on appeal the district court reversed and remanded for a calculation of the stock’s value that included Dr. Prince’s goodwill. On remand, the bankruptcy court’s recomputation arrived at a markedly higher value for the stock. After the entry of judgment, the unsecured creditors committee filed a motion to alter or amend the judgment on the basis of newly discovered evidence. The bankruptcy court granted the motion and amended its judgment to further increase the value of the stock, and the district court affirmed this decision on appeal. The Princes now challenge both the ruling that Dr. Prince’s goodwill was properly included in the value of his stock and the decision to grant the unsecured creditors committee’s motion to alter or amend the judgment, and we affirm.
 

 I. History
 

 On August 17, 1981, Dr. Prince and his wife filed a voluntary petition for bankruptcy reorganization under Chapter 11.
 
 See
 
 11 U.S.C. § 1101
 
 et seq.
 
 At the time of filing, Dr. Prince was the sole shareholder of a professional corporation, through which he operated his practice as an orthodontist. In February of 1983, the Princes filed a combined disclosure statement and plan of reorganization proposing the liquidation of their estate. The plan was supported by the unsecured creditors committee (the “Committee”) and was confirmed on November 4, 1983.
 

 The plan required the Princes to marshal the equity value of all their assets into a fund for distribution to their creditors. The Princes could either sell each asset and remit the sale proceeds to the fund, or they could retain an asset by depositing into the fund, over a three-year period, an amount equal to its equity value. The plan indicated that Dr. Prince wished to retain his orthodontics practice and would therefore pay the equity value of his stock in the professional corporation into the fund. The plan was confirmed, however, without the parties ever agreeing upon the stock’s value. In the plan, the Princes disclosed that the corporation’s physical assets were worth $25,000, less equipment liens totaling $17,500, and thus proposed to pay an equity value of $7,500 into the fund, subject to audit and negotiations with the Committee. In the event that posteonfirmation negotiations failed to reach an accord as to the value of the stock, the plan provided that the dispute would be resolved at a valuation hearing before the bankruptcy court. The parties have yet to agree upon the stock’s worth.
 

 Less than four months after confirmation, Dr. Prince negotiated the sale of his practice to an orthodontist from New York, Dr. Timothy J. Clare. On February 25, 1984,- the two doctors signed a written sales contract, wherein Dr. Clare promised to pay a purchase price of $450,000,
 
 [1]
 
 with payments to
 
 *317
 
 commence in September of 1984. Dr. Prince’s obligation under the agreement was threefold: First, he promised to transfer all of the professional corporation’s stock to Dr. Clare. Second, Dr. Prince agreed to enter into a covenant not to compete, under which he was prohibited for five years from practicing within ten miles of any community he had previously served. Third, Dr. Prince undertook a “practice obligation” to provide transitional services during the interim period— i.e., from February to September, Dr. Prince would pay some of Dr. Clare’s expenses (salary, housing, gas, insurance, travel), continue to practice on a part-time basis, and use his best efforts to build a rapport between his patients and Dr. Clare. After working together until only June, however, the two doctors had a falling out, and the actual sale in September was never consummated.
 

 In November of 1988, the bankruptcy court held a hearing to determine the value of Dr. Prince’s stock in his professional corporation. The Committee and the Princes each put forth an expert witness, and the bankruptcy court believed that “[bjoth experts testified in a credible fashion, consistent with their respective assumptions.” The Committee’s expert concluded that the stock of the professional corporation was worth $650,000, based on a capitalization of the stream of cash flows that the practice was likely to produce in the future (Dr. Prince had previously disclosed that he enjoyed an annual income from the practice of between $250,000 .and $300,000). The Committee’s expert conceded, however, that this value would not exist if Dr. Prince were to leave and compete with the corporation. The expert testified that without the personal goodwill of Dr. Prince — defined by the bankruptcy court as “the confidence that his patients had in him as an orthodontist” — the stock would have only nominal value.
 

 The methodology of the Princes’ expert assumed that Dr. Prince’s goodwill should not be included in the stock’s value because the professional corporation did not possess a covenant not to compete from Dr. Prince. As a result, and consistent with the Committee expert’s concession, he determined that the corporation’s stock was equal to the liquidation value of its physical assets, or $7,500. The Princes’ expert admitted, however, that almost every sale of a medical or dental practice entails the execution of a covenant not to compete, the exceptions usually being where a physician has expired and thus presents no risk of competition.
 

 On the basis of the experts’ testimonies, the bankruptcy court found virtually every fact in this case to be undisputed and distilled the valuation down to one issue of law: “whether Dr. Prince’s personal goodwill should be included in the calculation of [the stock’s] value.” The bankruptcy court determined as an initial matter that Dr. Prince’s goodwill fell within the personal earnings exception of 11 U.S.C. § 541(a)(6), which excludes the debtor’s postcommencement earnings from the bankruptcy estate in a liquidation. Because the liquidation of the Princes’ estate was proposed as part of a plan of bankruptcy reorganization under Chapter 11, rather than as a Chapter 7 liquidation, the bankruptcy court recognized that the parties could have bargained around § 541(a)(6)’s presumptive exclusion and particularly specified whether the value of Dr. Prince’s goodwill was to be paid into the fund. However, the court found that the plan itself did not evidence the parties’ intention either to include or exclude the value of Dr. Prince’s goodwill, and thus it concluded that the stock’s worth was limited to the $7,500 value of the professional corporation’s physical assets.
 

 On appeal, the United States District Court for the Northern District of Illinois disagreed with the bankruptcy court and held that Dr. Prince’s goodwill did
 
 not
 
 fall within the personal earnings exception of 11 U.S.C. § 541(a)(6). As a result, the district court remanded the case, instructing the bankruptcy court to include the worth of Dr. Prince’s goodwill in the stock’s value. Because the bankruptcy court had determined that the stock’s worth was limited to $7,500, and thus had not endeavored to assign a value to Dr. Prince’s goodwill, the district court advised the bankruptcy court how it should go about calculating the value of the goodwill. Finding the arm’s length sale agreement between Dr. Prince and Dr. Clare
 
 *318
 
 to be an accurate proxy for the worth of the stock, the district court directed the bankruptcy court to calculate the value of Dr. Prince’s stock (physical assets plus goodwill) by subtracting the amount of Dr. Clare’s salary and expenses paid under the contract, as well as the value of the tangible services performed by Dr. Prince during the interim period, from the purchase price to be paid by Dr. Clare.
 

 On remand, the bankruptcy court accepted evidence and argument as to the value of the amounts that should be offset against the purchase price in determining the worth of the stock. During final argument, it occurred to the court and the parties that a crucial issue was whether Dr. Prince or Dr. Clare received the income from the practice during the interim period. If Dr. Clare received the income, then some portion of the purchase price could be considered compensation for Dr. Prince’s part-time labors during the interim period rather than for the stock, and thus the value of these labors would be properly deducted from the purchase price in determining the value of the stock. On the other hand, if Dr. Prince received the income himself, then that income would be his compensation, and the value of his interim labors would not be offset against the purchase price.
 

 Without adjournment, the bankruptcy court recalled Dr. Prince to testify as to which doctor received the practice’s income during the interim, and Dr. Prince testified that Dr. Clare had received such income. The Committee argued that this testimony was inconsistent with the fact that Dr. Clare was paid an interim salary under the sales contract, but it could offer no real evidence at that time to contradict Dr. Prince’s testimony. Thus, on the basis of the evidence from this hearing, the bankruptcy court recalculated the value of Dr. Prince’s stock to be $292,290, which represented the purchase price of $450,000, less (1) the amount of Dr. Clare’s salary and expenses that were paid under the contract and (2) an assigned wage for Dr. Prince’s part-time labor during the interim period.
 

 The Committee promptly filed a motion to alter or amend the judgment under Fed. R.Civ.P. 59(e), pointing to evidence in the record suggesting that Dr. Prince had received the income from the practice during the interim period and therefore that an assigned wage for Dr. Prince’s part-time interim labor should not have been deducted. Before ruling on the motion, the bankruptcy court granted the Committee leave to obtain the practice’s bank records to determine conclusively the recipient of the income. After reviewing the bank records, the bankruptcy court found it indisputable that Dr. Prince had in fact received the practice’s interim income. As a result, the bankruptcy court granted the Committee’s motion and amended the judgment to value the stock at $405,-440. On appeal, the United States District Court for the Northern District of Illinois affirmed the bankruptcy court’s decision to grant the motion.
 

 II. Analysis
 

 The Princes now ask this court to resolve two issues: (1) whether the district court erred in directing the bankruptcy court to include Dr. Prince’s goodwill as part of the value of his stock in the professional corporation; and (2) whether the district court erred by affirming the bankruptcy court’s grant of the Committee’s motion to alter or amend the judgment.
 

 A. Valuation of Dr. Prince’s Stock
 

 The Princes proposed the liquidation of their estate as a plan of reorganization under Chapter 11, rather than as a bankruptcy liquidation under Chapter 7. As such, the bankruptcy court correctly noted that the parties could have particularly specified in the plan the dollar value for the stock that Dr. Prince would be required to pay into the creditors’ fund. The parties and the lower courts agree, however, that the plan contains no indication of the parties’ intent concerning whether goodwill should be included in, or excluded from, the proper valuation of the stock. Therefore, we must determine whether Dr. Prince’s goodwill should, in the absence of guidance from the parties, be included as part of the value of his stock — a determination that presents a question of law, over which we exercise
 
 de novo
 
 
 *319
 
 review.
 
 Pilditch v. Board of Educ. of the City of Chicago,
 
 3 F.3d 1113, 1115 (7th Cir. 1993),
 
 cert. denied, Pilditch v. Gool,
 
 — U.S. -, 114 S.Ct. 1065, 127 L.Ed.2d 385 (1994).
 

 We are not asked on appeal to review the district court’s application of law to the facts because the factual consequences hinging upon whether Dr. Prince’s goodwill is treated as part of the stock value are undisputed. Both parties agree that if Dr. Prince’s goodwill is excluded from the valuation calculus, the worth of the stock is limited to the $7,500 of physical assets. On the other hand, assuming that Dr. Prince’s goodwill is properly included in the stock’s value, the Princes do not assert error in the bankruptcy court’s numerical computation of the goodwill’s value; they appeal only the district court’s grant of the Committee’s motion to alter or amend the judgment on the basis of new evidence.
 

 The Prinees contend that they are required to pay no more than the $7,500 value of the practice’s physical assets into the creditors’ fund, and their argument in support of this contention has two components. First, they argue that from a conceptual standpoint, Dr. Prince’s goodwill should not be included in the value of the professional corporation’s stock. Secondly, the Princes argue (as the bankruptcy court initially decided) that even if Dr. Prince’s goodwill does theoretically constitute part of the worth of the stock, the value of the goodwill must be excluded from the bankruptcy estate by virtue of the Bankruptcy Code’s postcommencement earnings exception in 11 U.S.C. § 541(a)(6).
 

 Addressing the first component of the Princes’ argument requires a brief explanation of the principles of stock valuation. See
 
 generally
 
 RiohaRD A. BREALey
 
 &
 
 Stewart C. Myers, Prinoiples Of Corporate Finanoe 29-68 (4th ed. 1991). In general, stock as an asset has value because of its capacity to generate cash flows in the future.
 
 [2]
 
 Shareholders may expect to receive future cash flows from the stock in three ways: (1) as dividends when corporate profits are periodically distributed to the company’s shareholders; (2) as capital appreciation (or decline) when the stock is sold at some point in the future for a profit ,(or loss); and/or (3) as liquidation distributions when, upon dissolution of the company, the shareholders receive the residual value of the company’s assets after all creditor claims have been satisfied. In financial terms, the value of the stock on any given day (its “present value”) is how much money an investor would be willing to pay on that given day in order to obtain the right to receive the stock’s cash flows in the future.
 
 See also Beerly v. Dept. of Treasury,
 
 768 F.2d 942, 946 (7th Cir.1985),
 
 cert. denied,
 
 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 301 (1986).
 

 Theoretically, the stock’s present value would be derived first by plotting out the stock’s expected future cash flows, based essentially on an aggregation of the probabilities of all possible future events. This projected stream of income would then be “discounted” back to the present day (i.e., reduced to the value that someone would be willing to pay today for the expected cash flows in the future), using a discount factor that accounts for (1) the uncertainty (or riskiness) of the future cash flow projections and (2) the purchaser’s opportunity cost of investing money in the stock rather than in some other available wealth-producing asset.
 

 Unfortunately, it is often quite difficult to accurately estimate stock’s future cash flows or to choose the appropriate discount factor. As a result, calculations of stock’s present value will invariably be uncertain approximations.
 
 See Metlyn Realty Corp. v. Esmark, Inc.,
 
 763 F.2d 826, 835-36 (7th Cir.1985); Daniel R. Fischel,
 
 The Appraisal Remedy in Corporate Law,
 
 1983 Am. B. Found. Res. J. 875, 890-91. The Committee expert attempted to estimate the present value of the stock by projecting the practice’s past earnings into the future and then discounting these future cash flows back to the time of confirmation using what he believed to be the appropriate discount factor. Conceptually, the Committee expert had the right idea: on
 
 *320
 
 the date of confirmation, while Dr. Prince owned the stock, the value of the stock would indeed be the discounted value of the future cash flows that on that date Dr. Prince’s practice could have been expected to receive in the future. The Committee expert’s calculation of earnings value, however, was subject to a significant range of error based on the expert’s subjective choice of a discount factor, as well as on the fact that the expert’s projections of future cash flows were based on some function of Prince’s
 
 past
 
 earnings from his practice, which could have been, but were not necessarily, an accurate reflection of what his practice’s earnings would be in the future.
 
 See Metlyn Realty,
 
 763 F.2d at 835; Fischel, 1983 Am. B. Found. Res. J. at 891.
 

 Due to these difficulties in approximation, where market information is available, looking to the stock’s “fair market value” — what an arm’s length buyer would be willing to pay for the stock on the open market — is generally the best means of gauging the stock’s present value. This court has noted that in a properly functioning market, especially where the stock is frequently traded among a number of different buyers and sellers, the price that buyers are presently willing to pay — and that sellers are willing to accept — for shares of the stock is usually the most accurate representation of the present value of the stock’s future cash flows.
 
 Beerly,
 
 768 F.2d at 946;
 
 Metlyn,
 
 763 F.2d at 835. The collective appraisal of market participants is considered to be a more reliable measure of the stock’s value than the subjective estimates of one or two expert witnesses.
 
 Metlyn,
 
 763 F.2d at 835;
 
 Fischel,
 
 1983 Am. B. Found. Res. J. at 891 & n. 68.
 

 As a result, the district court instructed the bankruptcy court to look to the purchase price agreed upon by Dr. Prince and Dr. Clare as an estimate of the stock’s present value on the date of confirmation. Now it is true that, as in this case, where stock is traded infrequently (or only once), recent sales may not be as reliable an indicator of current value as the equilibrium market price for a stock that is heavily traded “because they impound valuations by only a few buyers and sellers, and because circumstances may have changed since those sales took place.”
 
 Beerly,
 
 768 F.2d at 946. However, here Dr. Clare and Dr. Prince negotiated the stock’s sale price at arm’s length; as orthodontists they both had considerable information concerning the probable worth of the practice; and the signing of the sale agreement occurred almost concurrently with the confirmation of the plan. As a result, the agreed-upon purchase price is likely to represent a reasonably accurate estimation of the present value of Dr. Prince’s stock on the date of confirmation.
 

 The Princes argue that when measuring the present value of the practice, the worth of the stock should be limited to the $7,500 liquidation value of the practice’s physical assets. In most cases, liquidation value is only an appropriate estimation of stock worth where a company is dissolving.
 
 Shanno v. Magee Indus. Enter., Inc.,
 
 856 F.2d 562, 566 (3d Cir.1988). In dissolution, liquidation distributions are the only foreseeable future cash flows to the shareholder, and thus liquidation value is an accurate tool for measuring the stock’s present value. On the other hand, where a business is expected to continue as a going concern, the company’s expected future earnings from operations often far exceed the liquidation value of the company’s physical assets. Thus, when valuing a business that is continuing to operate as a going concern, liquidation value is generally an inaccurate approximation of what shares are worth to the shareholders.
 
 See Beerly,
 
 768 F.2d at 946;
 
 see also In re Winthrop Old Farm Nurseries,
 
 50 F.3d 72, 74
 
 &
 
 n. 2 (1st Cir.1995) (collecting eases).
 

 Nonetheless, the Princes maintain that the stock’s worth on the date of confirmation was no more than the $7,500 value of the practice’s physical assets because the corporation did not possess a covenant not to compete from Dr. Prince. They reason that because (as the Committee expert conceded) the stock would be worth only $7,500 if Dr. Prince were to leave the corporation and compete with it, and because the corporation did not have a contractual guarantee that Dr. Prince would not leave and compete, the stock value should be limited to $7,500.
 

 
 *321
 
 This argument, however, misunderstands the concept of present valuation. The bankruptcy court’s task was not to determine the present value of the stock as of some hypothetical future day when Dr. Prince left to compete with his own corporation, but to determine the value of the stock on the day the bankruptcy reorganization plan was confirmed. Present value is derived by discounting back a projected stream of future cash flows, and this stream of cash flow projections is based on the probability of possible future events. On the day the plan was confirmed, Dr. Prince’s leaving and competing with the corporation was hardly a 100 percent certainty. It was a possible event that affected the value of the stock: the higher the probability of him competing, the lower the expected future cash flows to the stock, and the lower the probability of him competing, the higher the expected future cash flows to the stock. But the mere possibility that he might leave to compete with the corporation does not render the stock worthless any more than the possibility of fire destroying an uninsured house strips that house of every cent of its present value. What is important for calculating present value is the
 
 probability
 
 of a particular future event occurring.
 

 Granted, if Dr. Prince’s professional corporation had for some reason possessed a covenant not to compete from Dr. Prince, it would have ensured that the probability of his leaving to compete with the practice would be zero.
 
 [3]
 
 However, it is not clear that the probability of him leaving and competing was any higher than zero despite the absence of a covenant not to compete. At the time the plan was confirmed, Dr. Prince was operating the practice, and it seems quite unlikely that while still owning the stock he would have abandoned his practice, moved across the street, and competed with himself. When Dr. Prince agreed to sell the practice to Dr. Clare, a covenant not to compete became necessary because there would exist a significant probability that Dr. Prince might compete with Dr. Clare and thereby reclaim any goodwill transferred as part of the sale. But at the time of confirmation, when Dr. Prince owned the stock himself, there was no need for a covenant not to compete in order to protect Dr. Prince’s substantial goodwill, which constituted the lion’s share of the stock’s value.
 

 The considerable value of the practice to Dr. Prince on the date of confirmation is illustrated by the amount of money that four months later Dr. Clare agreed to pay under the sale agreement. The Princes attempt to reconcile this with their contention that the stock was worth only $7,500 when Dr. Prince owned it by pointing to Dr. Prince’s promises under the purchase agreement that he would use his best efforts to build a rapport between his patients and Dr. Clare, and that he would enter into a covenant not to compete. They argue that the covenant not to compete and Dr. Prince’s best efforts were newly created value, paid for by Dr. Clare, which did not exist at the time of confirmation when Dr. Prince owned the practice.
 

 This argument, however, misunderstands how the covenant and Dr. Prince’s efforts were valuable primarily as a means to effectively transfer the value of Dr. Prince’s goodwill to Dr. Clare. At the time of confirmation, Dr. Prince’s goodwill (his relationship of trust and loyalty with his patients) resulted in a significant amount of business, and thus earnings, for his practice. Under the sale agreement, Dr. Prince’s best efforts at encouraging his patient base to continue seeing Dr. Clare were intended to substitute Dr. Clare for himself in the relationships of goodwill he enjoyed with his patients. In other words, they were to transfer Dr. Prince’s goodwill to Dr. Clare. Given that after this transfer Dr. Prince could theoretically open up shop across the street, reclaim his patients, and (as the Committee expert noted) thereby leave Dr. Clare with only nominal value in the stock, the covenant not to compete was intended to ensure that Dr. Prince’s
 
 *322
 
 transfer of his goodwill to Dr. Clare would not be illusory. Thus, the covenant not to compete and Dr. Prince’s best efforts did not represent the transfer of additional value to Dr. Clare over and above the value of the stock to Dr. Prince. Rather, they were used (as they are in virtually every sale of a medical or dental practice) merely to ensure that after the sale the practice would be as valuable in Dr. Clare’s hands as it had been in Dr. Prince’s.
 

 Now this is not to mean that the covenant not to compete had no value to Dr. Clare. Rather, it means that without it, Dr. Prince’s goodwill would not have been as valuable to Dr. Clare as it had been to Dr. Prince because the probability that Dr. Prince would turn around and compete with Dr. Clare was much greater than the probability that Dr. Prince would compete with himself. The purpose of the covenant not to compete was to ensure that the transfer of the goodwill together with the covenant would be worth roughly the same amount to Dr. Clare as the goodwill itself had been worth to Dr. Prince. The purchase price was therefore an appropriate measure for the bankruptcy court to rely upon when determining the value of the stock in Dr. Prince’s hands on the date of confirmation.
 

 Thus, from a conceptual standpoint, the present value of Dr. Prince’s stock cannot be limited to the $7,500 value of the practice’s physical assets. Instead, the bankruptcy court was entirely justified in looking to the Committee expert’s calculations or the agreed-upon purchase price between Dr. Prince and Dr. Clare as evidence of the stock’s present value. However, given that the need for this valuation arises in bankruptcy, a calculation of the stock’s present value is not the end of our inquiry. Although the Bankruptcy Code casts a broad net over the assets of the debtor, pulling virtually all the debtor’s property interests into the bankruptcy estate, the Code expressly excludes “earnings from services performed by an individual debtor after the commencement of the case.” 11 U.S.C. § 541(a)(6). This exclusion applies to Chapter 11 bankruptcies,
 
 see In re FitzSimmons,
 
 725 F.2d 1208, 1211 (9th Cir.1984); therefore, to the extent that any portion of the stock’s present value represents postcommencement earnings from Dr. Prince’s services, it is not part of the bankruptcy estate and must be excluded from the amount that Dr. Prince is required to pay into the fund.
 

 The present value of stock in a company can be separated into what portion of the stock’s value is attributable to which of the company’s assets. Some of the value of stock may flow from the company’s physical assets, such as equipment. Some of the company’s future cash flows may be attributable to the company’s human capital — its employees’ skills and labor. And some of a stock’s value may derive from the company’s intangible assets, such as a trademark or general “goodwill.” Goodwill is an intangible asset that represents the ability of a company to generate earnings over and above the operating value of the company’s other tangible and intangible assets. It often includes the company’s name recognition, consumer brand loyalty, or special relationships with suppliers or customers.
 

 A good portion of the present value of the professional corporation’s stock on the date of confirmation stems from the human capital of its sole employee on that date, Dr. Prince. Dr. Prince’s services are valuable because of his various personal attributes, including-his natural skills, his personality and demeanor, his extensive training and professional knowledge, and his license to practice dental medicine. By expending his labor in providing these services, Dr. Prince generated earnings for the practice, which resulted in profits flowing to the professional corporation’s shares of stock. That portion of the stock’s worth on the date of confirmation representing the value of Dr. Prince’s future skilled labor is undisputedly excluded from the estate by virtue of the § 541(a)(6) post-commencement earnings exception.
 

 However, not all of the stock’s present value is attributable to Dr. Prince’s future skilled labor, a fact evidenced by the sale agreement between Dr. Prince and Dr. Clare. The sale agreement price represents the value of the practice
 
 over and above
 
 the
 
 *323
 
 value of Dr. Prince’s labors.
 
 [4]
 
 To explain, after the consummation date of the sale, Dr. Prince was not expected to continue working for the practice; rather, Dr. Clare intended to substitute
 
 his own
 
 future skilled labor for that of Dr. Prince. Thus, after subtracting the amount of Dr. Clare’s expenses and salary paid during the interim period by Dr. Prince, the purchase price represents the present value of the practice, excluding the worth of Dr. Prince’s future labors — i.e., the present value of the corporation’s physical assets and Dr. Prince’s goodwill.
 

 The Princes contend, as the second component of their argument, that they should only have to pay into the creditors’ fund the $7,500 of the purchase price that represents the value of the corporation’s physical assets. They argue that Dr. Prince’s goodwill is, like his skills, training, and dental license, a personal attribute — that his goodwill is merely part of his human capital and therefore must be excluded from the bankruptcy estate under the § 541(a)(6) earnings exception. In an important sense, however, Dr. Prince’s goodwill is unlike his skills, his schooling, or his dental license. These components of Dr. Prince’s human capital can only manifest their value by increasing the worth of his future labors. Dr. Prince’s innate physical ability, his personality, or his professional degree increase the market value of his services, but they cannot be sold to another orthodontist; they have value only as attributes of Dr. Prince. On the other hand, Dr. Prince’s goodwill, like the practice’s physical equipment, can be sold and transferred, and once sold and transferred can generate value for another orthodontist. Although the mechanism of using his best efforts to transfer his patients’ loyalties to Dr. Clare and then securing the transfer with a covenant not to compete is not as simple as signing over title to a physical asset, the functional effect is the same. Dr. Prince could sell and deliver his goodwill to Dr. Clare, and Dr. Clare would then reap the value of the asset. Thus, Dr. Prince’s goodwill is not intrinsically part of his human capital, but rather is a separate intangible capital asset of the practice, like a trademark would be.
 
 [5]
 

 The courts have interpreted the postcom-mencement earnings exception extremely narrowly, holding that § 541(a)(6) excepts only earnings from services actually performed by an individual debtor after the date of commencement and that cash flows representing return on capital assets (even intangible ones) are not earnings from services of the debtor.
 
 See In re FitzSimmons,
 
 725 F.2d at 1211.
 
 In re FitzSimmons
 
 involved an individual attorney operating his practice as a sole proprietorship, a situation quite analogous to Dr. Prince and his wholly owned professional corporation. The attorney, FitzSimmons, objected to being directed to pay any of his practice’s future profits to his creditors as part of a Chapter 11 reorganization, arguing that the profits were excluded from the bankruptcy estate by § 541(a)(6). The Ninth Circuit held:
 

 FitzSimmons is thus entitled to monies generated by his law practice only to the extent that they are attributable to personal services that he himself performs. To the extent that the law practice’s earnings are attributable not to FitzSimmons’ personal services but to the business’ invested capital, accounts receivable,
 
 good will,
 
 employment contracts with the firm’s staff,
 
 client relationships,
 
 fee agreements, or the like, the earnings of the law practice accrue to the estate.
 

 Id.
 
 (emphasis added). The same is true of Dr. Prince’s stock in his professional corporation. The value of earnings from future ser
 
 *324
 
 vices performed by Dr. Prince are excluded from the bankruptcy estate. As discussed above, this exclusion was accomplished by the bankruptcy court’s looking to the agreed-upon purchase price as evidence of the stock’s value. The purchase price (less Dr. Clare’s interim salary and expenses) includes the value of the practice’s physical assets (undisputedly part of the bankruptcy estate) and Dr. Prince’s goodwill. The value of Dr. Prince’s goodwill represents future cash flows not from earnings for future services actually performed by Dr. Prince, but from return on an intangible capital asset that could be sold and transferred with the sale of the practice. The value of Dr. Prince’s goodwill is therefore not excluded from the estate by virtue of § 541(a)(6), and according to the plan of reorganization it must be paid by the Princes into the creditors fund.
 

 B. Motion to Alter or Amend the Judgment
 

 A court may grant a Rule 59(e) motion to alter or amend the judgment if the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest-error of law or fact.
 
 Russell v. Delco Remy Div. of General Motors Corp.,
 
 51 F.3d 746, 749 (7th Cir.1995);
 
 LB Credit Corp. v. Resolution Trust Corp.,
 
 49 F.3d 1263, 1267 (7th Cir. 1995) (quoting
 
 FDIC v. Meyer,
 
 781 F.2d 1260, 1268 (7th Cir.1986)). The decision whether to grant or deny a Rule 59(e) motion is entrusted to the sound judgment of the district court, and we will reverse only for an abuse of discretion.
 
 LB Credit Corp.,
 
 49 F.3d at 1267.
 

 In its motion to alter or amend the judgment, the Committee pointed to evidence in the record contradicting Dr. Prince’s testimony that Dr. Clare had received the income from the practice during the interim period. This evidence in the record, however, did not clearly demonstrate a manifest error of fact; it merely suggested that Dr. Prince’s testimony might have been incorrect. Instead, the bankruptcy court’s decision to amend the judgment was based on the conclusive proof of the practice’s bank records, which were
 
 not
 
 offered into evidence prior to the entry of judgment. Because the bank records were “newly discovered” evidence, rather than evidence existing in the record, the bankruptcy court was authorized to amend the judgment on the basis of the records only if the evidence was unavailable to the Committee at the time of the hearing.
 
 See Figgie Int’l Inc. v. Miller,
 
 966 F.2d 1178, 1180 (7th Cir.1992).
 

 The Princes argue that the district court abused its discretion by granting the Committee’s Rule 59(e) motion because the bank records were in existence and accessible by the public — and therefore technically available-prior to the entry of judgment. But this argument reflects a far too simplistic interpretation of availability. This court has held that “[a] Rule 59(e) motion cannot be used to present evidence that
 
 could and should
 
 have been presented prior to the entry of final judgment.”
 
 Retired Chicago Police Ass’n v. City of Chicago,
 
 76 F.3d 856, 867 (7th Cir.1996) (emphasis added). Where a party is made aware that a particular issue will be relevant to its case but fails to produce readily available evidence pertaining to that issue, the party may not introduce the evidence to support a Rule 59(e) motion.
 
 Green v. Whiteco Indus., Inc.,
 
 17 F.3d 199, 202 n. 5 (7th Cir.1994). However, it appears that in this case the parties did not have sufficient indication prior to the hearing that the recipient of the interim income would be a relevant issue, and even once the relevance of the issue was discovered the parties were not given an opportunity to collect evidence bearing on the question. On remand to redetermine the value of Dr. Prince’s stock including goodwill, the district court had instructed the bankruptcy court to consider “the purchase price paid by Dr. Clare, less the value of the tangible assets and
 
 the value of the transitional services rendered by Dr. Prince
 
 in connection with the sale.” (emphasis added). In light of this directive, both parties (as well as the bankruptcy court) assumed at the hearing that an amount would be deducted for Dr. Prince’s part-time labors during the interim period, and they focused on quibbling over how much. Only during final argument, after all the evidence had been introduced, did it occur to the bankruptcy court and the parties that wheth
 
 *325
 
 er Dr. Prince received the practice’s interim income was a crucial question.
 

 Like the Committee and the bankruptcy judge, the Princes did not anticipate that the recipient of the interim income would be in issue and thus did not access the practice’s bank records. In fact, when called to the stand, Dr. Prince testified that Dr. Clare had received the practice’s income — testimony that directly contradicted the bank records’ conclusive evidence. As a result, the Princes cannot maintain that the Committee was at fault for similarly failing to foresee the relevance of the bank records and therefore neglecting to produce them.
 

 Given that the Committee had no reason to have obtained the bank records prior to the hearing, and that the bankruptcy court did not grant a continuance in order for the parties to gather evidence on the question once its relevance became apparent, we find that the bank records were effectively unavailable to the Committee prior to the entry of judgment. The bankruptcy court, therefore, did not abuse its discretion in granting the Committee’s timely motion to amend the judgment on the basis of the bank records. As the district court summarized, the bankruptcy court here was faced with a choice: “It could reopen the proofs and reach a correct result or it could knowingly enter an erroneous judgment giving Dr. Prince a $105,000 windfall as a result of his own false testimony.” We cannot find error in the bankruptcy court’s choosing the former.
 

 Both decisions of the district court are hereby
 

 Affirmed.
 

 [1]
 

 . More precisely, the agreement stated that Dr. Clare would pay "$450,000.00 amortized at 12 percent simple interest for 5 years, and $500,-000.00 amortized at 10 percent simple interest for 5 years. The payment amount shall be $120,-000 per year including principal and interest. The balance, if any, from each of these calculations at the end of the five year period shall be averaged to obtain the final payment amount for the sixth year.”
 

 [2]
 

 . This, of course, excepts those situations where a shareholder derives some nonpecuniary personal benefit from part ownership in a company — such as where a life employee proudly holds stock in his employer, or where a loyal fan holds stock in his favorite sports franchise.
 

 [3]
 

 . Of course, the existence of an enforceable covenant not to compete would not absolutely ensure that Dr. Prince would not compete with the corporation. It would, however, make Dr. Prince liable for any loss in revenue to the corporation from his competition, and thus would ensure that there would be no reduction in cash flows to the stock as a result of any competition from Dr. Prince.
 

 [4]
 

 . This, together with the significant margin of error inherent in earnings value calculations, likely accounts for the discrepancy between the Committee expert's estimates and the agreed-upon purchase price.
 

 [5]
 

 . Note that the mere fact that Dr. Prince's goodwill was created through years of his practicing in the community does not alter the conclusion that it is an asset separate from his human capital. If Dr. Prince were to have fashioned one of the practice's physical assets with his own hands, this would not change the fact that the asset could be sold and, therefore, that the asset had value independent of Dr. Prince. The earnings exception does not exclude earnings from an asset created by a debtor's past labors, only the earnings from actual services performed by the debtor in the
 
 future.