## In re Stephen L. VECCHITTO, Debtor.

### Martin W. Hoffman, Trustee, Plaintiff,

### v.

### Stephen L. Vecchitto, Vecchitto, Schnidman, Macca & Company, P.C., Defendants.

### Bankruptcy No. 93–22346.
### Adversary No. 95–2187.

United States Bankruptcy Court,
D. Connecticut.

March 30, 1999.

Martin W. Hoffman, Hank D. Hoffman, and Walter J. Onacewicz, Law Offices of Martin W. Hoffman, West Hartford, CT, for Trustee–Plaintiff.

David A. Netburn, Michael D. O'Connell, and Julia B. Morris, O'Connell, Flaherty & Attmore, LLC., Hartford, CT, for Defendants.

## MEMORANDUM OF DECISION

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

### I.

### ISSUE

The dominant issue in this adversary proceeding is the proper value to be placed upon 220 shares of stock of a closely-held corporation. Martin W. Hoffman, Esq., trustee ("the trustee") in the Chapter 7 case of Stephen L. Vecchitto, the debtor ("the debtor"), on July 12, 1995, filed a three-count complaint against the debtor, a certified public accountant, and against Vecchitto, Schnidman, Macca & Company, P.C. ("VSM"), a corporate firm of licensed certified public accountants. In Count I, the trustee contends that the debtor's estate included as an asset 220 shares of stock in a corporate firm of licensed certified public accountants known as Vecchitto, Macca & Glotzer, P.C. ("VMG"); that in his schedules, the debtor listed the stock as having no value and claimed the stock as an exemption to the value of $3,808; that the trustee has objected to the exemption claim; and that the stock has a value of at least $242,000 to be turned over to the trustee.[1] In Count II, the trustee alleges that, post-petition, VMG sold its assets to VSM, and the debtor received a 30% stock interest in VSM, which interest became property of the debtor's estate and should be turned over to the trustee. Count III asserts that the sale of VMG's assets to VSM was a post-petition avoidable transfer and their value is recoverable from the defendants.

The complaint seeks a judgment against the debtor and VSM for $242,000 or the value of the debtor's interest in VMG or VSM and the avoidance of the transfer of the debtor's interest in VMG to VSM. The defendants deny any liability to the trustee, contending that the stock had no value and, thus, all of the counts of the complaint must fail. A hearing on the complaint concluded on December 30, 1998, after which the parties submitted their memoranda of law.

### II.

### BACKGROUND

#### A.

When the debtor filed his Chapter 7 bankruptcy case on June 14, 1993, he was employed as an accountant by VMG. He testified that the filing of the bankruptcy petition was caused by real estate investments which were rendered valueless by the then recent downturn in the Hartford real estate market. He scheduled as an asset 220 shares of stock in VMG. Carmen Macca, CPA ("Macca"), VMG's corporate secretary, held the remaining 780 shares of VMG stock. VMG, on September 1, 1993, sold most of its assets, in an arm's length transaction with Schnidman & Company P.C. to merge their accounting practices, to the defendant, VSM, a newly-formed entity.[2] Macca executed a

---

1. On October 22, 1993, the trustee filed an objection to the debtor's amended claim of exemption of the stock "as to any amount in excess of the statutory amounts allowed." On November 11, 1993, when the trustee's objection came on for hearing, counsel for the trustee appeared and requested that the hearing be marked off the calendar. No further action on the objection appears of record, although the trustee in his post-trial brief makes the following statement: "Pursuant to an oral order of this Court, the Trustee's objection to exemption was merged with this law suit." (Trustee Brief at 3.)

2. The principals of VSM, all CPAs, and their initial stock ownership were as follows:
   **John Schnidman        35%**

corporate resolution representing that a two-thirds vote of VMG shareholders affirmed the sale. The sale price for VMG's account receivables and equipment was $200,050, to be paid by VSM's assumption of two VMG bank debts totaling $190,486 and the payment of $9,564 cash to VMG. VMG used the cash to pay other existing VMG obligations. No party noticed the trustee of this sale.

The debtor testified that he invested $10,000 in VSM and received 30% of VSM's stock. Three years later, on September 1, 1996, the debtor left VSM's employ and received $10,000 for his stock interest. At the same time, he signed a non-competition agreement with VSM which runs to August 30, 2001. The total compensation to be paid the debtor under this agreement is $225,000, payable in 48 monthly installments after an initial payment of $18,500.

### B.

On or about January 1, 1988, the debtor and Macca, as the sole VMG shareholders, entered into a Shareholders' Agreement ("Agreement") "to restrict the transfer of the stock of the Corporation by the Shareholders in such a manner so as to provide for an orderly disposition of the stock of any Shareholder who voluntarily ceases to be an employee of the Corporation, dies, becomes disabled, retires or desires to dispose of his stock." *Agreement* at 1. Paragraph 2.1 of the Agreement provided:

If a Shareholder shall resign, retire or otherwise terminate his employment as an employee of the Corporation, other than by death or disability, the other Shareholder shall have the option to purchase all or any part of the Stock owned by such Shareholder (the "Resigning Shareholder"). The other Shareholder shall have sixty (60) days after such resignation, retirement, or other termination of employment to exercise such option and purchase all or

any part of the Stock, owned by the Resigning Shareholder. The Corporation shall redeem, within thirty (30) days after the expiration of such sixty (60) day period, all of the Stock owned by the Resigning Shareholder which has not been purchased by the other Shareholder.

Paragraph 2.2, of the Agreement provided:

The purchase price of the stock to be purchased or redeemed pursuant to this Article 2 shall be equal to the Adjusted Net Book Value of the Corporation, as hereinafter defined, multiplied by a percentage determined under Section 2.4, and multiplied by a fraction, the numerator of which is the total number of shares of the Stock to be purchased and the denominator of which is the total number of the issued and outstanding shares of the common stock of the Corporation as of the date of such purchase.

The Agreement does not contain any mandatory non-competition agreement to be executed by the departing stockholder, and the Agreement terminated on VMG's bankruptcy, receivership, corporate liquidation or dissolution. At the time of the filing of his petition, the debtor was 36 years old and capable of continuing in his practice as, in fact, he did during the next three years.

The trustee presented Alec R. Bobrow, CPA, ("Bobrow") to testify as a duly-qualified expert on the fair market value of the debtor's 220 shares of VMG stock as of June 14, 1993, the date of the Chapter 7 filing. Bobrow valued the 220 shares of stock at $397,825. Bobrow's written appraisal ("Bobrow Appraisal"), received into evidence, defined "fair market value" as "that price, stated in money or money's worth, at which an asset would change hands between a willing seller and a willing buyer, neither being under a compulsion to act, and both having full knowledge of all relevant facts." (Bobrow Appraisal at 1.) Bobrow acknowledged that "tradi-

| | | | |
|---|---|---|---|
| Debtor | 30% | William Schuck | 10% |
| Macca | 20% | Bruce Del Conte | 5% |

tionally" there are three principal approaches to be employed to determine fair market value: (1) component asset-based valuation, (2) cash-flow-based valuation and (3) market formula-based valuation. (Bobrow Appraisal at 2.) Bobrow purposely used none of the three "traditional" methods, but relied solely on the formula and methodology described in the Agreement to calculate the stock's fair market value. He readily conceded that none of the triggering events under Par. 2.2 of the Agreement had occurred on June 14, 1993 or thereafter—namely, the debtor had neither resigned, retired nor terminated his employment with VMG. His conclusion was that if stockholders have entered into a stock-purchase agreement, "[n]eedless to say, [such agreement], if binding on the parties, will serve as the basis for valuation." (Bobrow Appraisal at 2.)

The defendants do not contest that Bobrow used the appropriate calculations contained in the Agreement to arrive at his valuation, if the Agreement controls. The debtor testified that even if the Agreement provisions were to control, VMG had no means to satisfy such obligation.

The defendants presented Walter C. King, CPA, ("King"), as their duly-qualified stock valuation expert witness. King, using the same definition of fair market value as Bobrow in his written appraisal ("King Appraisal"), received into evidence, valued the VMG shares of stock at zero after considering a market-value approach, an adjusted net-asset approach and an income-valuation approach. He rejected the use of the Agreement as a means of establishing fair market value because the Agreement mandated neither purchase of the debtor's stock upon his filing a bankruptcy petition nor purchase from the bankruptcy trustee. (King Appraisal at 16.) King also rejected the market-value approach because of the absence of a non-competition agreement to prevent the debtor from soliciting clients.

Under the income-valuation approach, which values a business "in one lump sum, including tangible and intangible assets by applying a capitalization rate to representation earnings," King determined that VMG had no value after deducting salaries. (King Appraisal at 11.) Likewise, the adjusted net-asset method, which "substitutes market values for balance sheet carrying amounts and arrives at the fair market value of the adjusted net assets", resulted in VMG showing a deficit so that the value of shares was zero. (King Appraisal at 14.)

## III.

### CONTENTIONS OF THE PARTIES

The trustee contends that, on the date the bankruptcy petition was filed, the terms of the Agreement fixed the value of the debtor's VMG stock at $397,825. Since the debtor exempted only $3,808 of the stock's value, the trustee seeks to recover the balance of $394,017 for the benefit of the bankruptcy estate, or, alternatively, the value of the debtor's interest in VSM, claiming that it constituted proceeds, product, offspring, rents, or profits of the debtor's stock in VMG.

The defendants do not dispute the accuracy of Bobrow's calculations under the formulas of the Agreement. They contend, however, that such calculations are irrelevant to the issue before the court— the determination of the fair market value of the debtor's VMG stock on the petition date—because the terms of the Agreement would have applied only if the debtor had retired, resigned, or otherwise terminated his employment with VMG while the Agreement was in effect, and that he did not do so. The defendants contend that, under any of the generally accepted methods of valuation, the fair market value of the VMG stock on the petition date was zero.

## IV.

### DISCUSSION

#### A. RELEVANCE OF THE AGREEMENT

The trustee's reliance on the formulas contained in the Agreement is mis-

placed. Shareholder agreements which impose, under certain circumstances, obligations on a shareholder to sell and ultimately on the corporation to buy shares are executory contracts [3] for purposes of the Bankruptcy Code. *See In re Parkwood Realty Corp.*, 157 B.R. 687, 689 (Bankr.W.D.Wash.1993) (holding that stockholder agreement is an executory contract). Section 365(d)(1) [4] gives the Chapter 7 trustee 60 days after the order for relief is entered in which to assume or reject executory contracts; at the end of that 60–day period, all executory contracts not assumed by the trustee are deemed rejected. This automatic rejection "constitutes a breach of such contract ... immediately before the date of the filing of the petition." 11 U.S.C. § 365(g). The provisions of the Agreement, therefore, are deemed not to have been in effect on the valuation date of June 14, 1993.

■ The debtor's bankruptcy petition (Exhibit 12) indicates that he did not schedule the Agreement as an executory contract. The debtor's failure to schedule the Agreement does not toll the running of the 60–day period, *see, e.g., Cheadle v. Appleatchee Riders Ass'n (In re Lovitt)*, 757 F.2d 1035, 1041 (9th Cir.1985), *cert. denied*, 474 U.S. 849, 106 S.Ct. 145, 88 L.Ed.2d 120 (1985) (holding that, under the Bankruptcy Act, trustee has an affirmative duty to investigate for unscheduled executory contracts and that the statutory presumption of rejection of such contracts not assumed within 60 days is conclusive); *Carrico v. Tompkins (In re Tompkins)*, 95 B.R. 722, 724 (9th Cir. BAP 1989) (quoting

*Lovitt* and adopting its holding in a Chapter 7 case under the Bankruptcy Code); *Affordable Efficiencies, Inc. v. Bane (In re Bane)*, 228 B.R. 835, 840 (Bankr.W.D.Va. 1998) (same). The trustee, apparently, became aware of the existence of the Agreement well before the commencement of this proceeding.

The court concludes that the trustee has not established that the formulas of the Agreement, and Bobrow's calculations based on those formulas, are relevant to the value of the debtor's VMG stock on the date the bankruptcy petition was filed; it, therefore, rejects Bobrow's testimony as to the value of the stock. In addition, the trustee presented no credible evidence to support use of the Agreement as a proxy for the fair market value of the debtor's VMG stock.

### B. FAIR MARKET VALUE

■ The reports of both expert witnesses utilized the same definition of fair market value. Both experts agreed as to the three approaches generally used to determine the fair market value of an asset, in this instance, the debtor's stock in VMG. *See supra* part II.B.

Having relied exclusively on the formulas in the Agreement, Bobrow testified that he made no attempt to determine the fair market value of the stock on any of the traditional bases. King testified as to market value under each of the three approaches, based on VMG's financial statements for the last full calendar year preceding the filing of the debtor's bankruptcy petition.[5]

---

**3.** An executory contract is "a contract on which performance remains due to some extent on both sides." *Eastern Air Lines, Inc. v. Ins. Co. of the State of Pennsylvania (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 998 (2d Cir.1996) (citations and internal quotation marks omitted).

**4.** Section 365 provides, in relevant part:

(d)(1) In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property

of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such contract or lease is deemed rejected.
11 U.S.C. § 365(d)(1).

**5.** The trustee argues that King should have used VMG's May 31, 1993 internal financial statements, rather than the December 31, 1992 figures. King testified that he tended to be wary of interim financial statements, prepared primarily for internal use, of closely-

### 1. Market–Value Approach

As previously noted, King rejected this method for valuing the stock. He testified that the debtor was a "rainmaker" and that when such a person leaves a firm without a non-compete agreement, it leaves the firm's client base completely vulnerable; he concluded that, under these circumstances, the probability that the clients of a departing shareholder would follow him elsewhere was so substantial that, in his opinion, the unprotected client base was of inconsequential value to VMG. Although King's report included market value calculations based on comparisons with the sales of several closely-held accounting firms, he rejected the use of such data because the firms were not sufficiently comparable to VMG, VMG held no non-compete agreements, had litigation pending against it, was under investigation, and had experienced declining revenues.

### 2. Adjusted Net–Asset Approach

Having concluded, under the facts presented, especially the absence of a non-compete agreement, that the value of VMG's client base was negligible, King used the fair market value of VMG's other assets—accounts receivable, furniture, fixtures, and equipment—and liabilities—estimated settlement value of threatened litigation, and payoff value of debt—to determine that, as of June 14, 1993, VMG had a negative net worth.

Although some of the litigation pending when the bankruptcy petition was filed in 1993 has subsequently settled, King's determination of fair market value correctly utilized the estimated settlement value as of June 14, 1993, rather than the amounts for which the suits actually settled years later. The fair market value of the stock on June 14, 1993 is the price a buyer would be willing to pay to acquire it on that date;

it is, therefore, properly determined prospectively as of that date, without the benefit of later hindsight.

### 3. Income–Valuation Approach

Under this approach, the fair market value of the company is equal to the present value of VMG's expected net-income stream. King calculated (a) a cash-flow multiple, taking into account his assumptions about various risks—including those based on company size, expected growth, and the type of business, and multiplied it by (b) VMG's representative earnings, its expected net income "normalized" by substituting industry averages for the actual amounts of the principals' salaries.

King based his estimate of VMG's representative earnings on its average normalized earnings for 1989–91. Although figures were available for 1992 and a portion of 1993, King noted that those amounts were distorted as a result of adjustments regarding the disposition of assets and cessation of business. He testified that, in his judgment, the earnings for 1989–91, reduced by 25% to take into account prepetition erosion of VMG's client base, were more indicative of expected future earnings. Because the representative earnings were not sufficient to provide the two principals with salaries equal to the industry average, the net income was zero. The present value of the net income, the fair market value of VMG, was, therefore, also zero, as was the value of the debtor's 22% share of VMG.

### C. VALUE OF GOODWILL

■ The court finds King's expert opinion that the debtor's stock had no market value supported by credible testimony. The trustee relies on *In re Prince*, 85 F.3d 314 (7th Cir.1996), to discredit King's opinion. *Prince* involved a Chapter 11 debtor

held businesses; that a number of significant adjustments are made only at the end of the year, and that the internal figures relied on the book, rather than market, value of several assets, including the accounts receivable. Be-

cause the year-end figures were those relied upon in the preparation of the company's tax returns, King testified that he had more confidence in their accuracy, and the court credits this testimony.

who was the sole shareholder of a professional corporation through which he operated his practice as an orthodontist. In *Prince*, the only issue was whether, in the absence of a non-compete agreement, the valuation of the debtor's stock on the date of plan confirmation should exclude, *as a matter of law*, any component for goodwill. *Prince*, 85 F.3d at 317 ("[T]he bankruptcy court found virtually every issue of fact in this case to be undisputed and distilled the valuation down to one issue *of law:* whether Dr. Prince's personal goodwill should be included in the calculation of the stock's value.") (emphasis added). The court held that goodwill was not excluded as a matter of law; that the amount of goodwill to be included depended upon the probability that the debtor would leave his own firm to compete with it, taking his patient base with him. However, the court was "not asked on appeal to review the district court's application of law to the facts because the factual consequences hinging upon whether Dr. Prince's goodwill is treated as part of the stock value are undisputed. Both parties agree that if Dr. Prince's goodwill is excluded ... the worth of the stock is limited to the ... physical assets. On the other hand, assuming that Dr. Prince's goodwill is properly included in the stock value, the Princes do not assert error in the bankruptcy court's numerical computation of the goodwill's value." *Prince*, 85 F.3d at 319.

In the present proceeding, goodwill is not being excluded as a matter of law. Rather, the question is one of fact: what value, if any, to place on the goodwill asset of a professional corporation when nothing prevents either or both of the shareholders from leaving to compete with it, taking their client bases with them.

King testified that, in his opinion, the absence of a covenant not-to-compete put VMG at substantial risk of losing its client base. Based on his assessment of this risk, King valued VMG's client base as zero under his market-based and asset-based calculations, and, in his income-based valuation, he reduced the three-year average earnings utilized by 25% to account for erosion of the client base. The court finds no conflict between the valuations based on King's opinions of the risks associated with the lack of non-compete agreements and the holding of *Prince*. The *Prince* court discussed the need to take into account the probability that the shareholder would leave to compete and the impact such action would have on the expected future earnings of the firm. The possibility of a shareholder competing "affected the value of the stock: the higher the probability of him competing, the lower the expected future cash flows to the stock." *Prince*, 85 F.3d at 321.

## V.

## CONCLUSION

The court finds that the value of the debtor's VMG stock on the bankruptcy petition date, was zero, or, in any event, less than the $3,808 exemption claimed by the debtor. Since the stock was fully exempt, the court concludes that the trustee is not entitled to any of the recoveries he seeks. The action will be dismissed with prejudice, and judgment will enter for the defendants.

## JUDGMENT

This action came on for trial before the Court, Honorable Robert L. Krechevsky, U.S. Bankruptcy Judge, presiding, and the issues having been duly tried, and the Court having issued a memorandum of even date, it is

ORDERED, ADJUDGED AND DECREED that the plaintiff take nothing, and that the action be dismissed on the merits.