**TO–AM EQUIPMENT COMPANY, INC.**

v.

**MITSUBISHI CATERPILLAR FORKLIFT AMERICA, INC., et al.**

**No. 95 C 0836.**

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 24, 1997.

---

Gary W. Leydig, Robin Lynn Hoberman,Levin, McParland, Phillips & Leydig, Chicago, IL, for To-Am Equipment Co., Inc.

John Edward Burke, Burke, Weaver & Prell, Chicago, IL, Angela Marsh, Keck, Mahin & Cate, Chicago, IL, Thomas J. Collin, Thompson, Hine & Flory, Cleveland, OH, Jacqueline Williams Vlaming, McBride, Baker & Coles, Oakbrook Terrace, IL, for Mitsubishi Caterpillar Forklift America, Inc.

John Edward Burke, Charles Daniel Knight, Burke, Weaver & Prell, Chicago, IL, for Shimpei Hashimoto, Toshimitsu Ishikawa, S. Toishi, Haruo Matsumoto, Asao Hirayama.

Angela Marsh, Keck, Mahin & Cate, Chicago, IL, for Pat Reilly, Richard F. Wagner, Robert G. Gilbride, Tetsu Okuno, Lloyd Knapp, Toshio Handa, R. Larry Weunch, Ryoji Odaka.

† Of the Seventh Circuit, sitting by designation.

**Opinion**

EASTERBROOK, Circuit Judge.†

Issues and litigants slowly have been winnowed from this case. Chief Judge Aspen dismissed the claims against several defendants and entered summary judgment against plaintiff To-Am Equipment on a counterclaim (for unpaid invoices) filed by defendant Mitsubishi Caterpillar Forklift America (MCFA). To-Am dismissed some additional claims and two additional defendants. The parties resolved the amount due on the counterclaim. One claim, based on the Illinois Franchise Disclosure Act, 815 ILCS 705/1 to 705/44, remained. After the case had been transferred to me, I entered an order restricting the theories of liability To-Am could use. In mid-trial, To-Am dismissed its claim against Robert Gilbride. The jury decided against To-Am and in favor of the other remaining individual defendant, Richard Wagner. To-Am prevailed, however, against MCFA, because the jury concluded that To-Am was a "franchisee." (MCFA conceded that, *if* To-Am was a franchisee, then its termination was improper.) The jury fixed damages at $1,525,000. MCFA now asks for judgment as a matter of law under Fed.R.Civ.P. 50(b), or a new trial unless To-Am accepts a remittitur. For its part, To-Am wants more than $500,000 in attorneys' fees, plus costs in addition to those authorized by 28 U.S.C. § 1920.

**I**

To-Am was established to service forklift trucks. Richard Todd, its principal owner, had been a successful forklift salesman at other firms, but he had been unable to open his own dealership for new forklift sales. That changed in 1985, when To-Am became a distributor of Mitsubishi forklifts in a five-county "area of primary responsibility" in northern Illinois and Indiana. Mitsubishi was new to selling in the United States and was struggling to establish its presence in the market. According to testimony at trial, its status as a fringe supplier led MCFA (Mitsubishi's U.S. agent for forklift trucks) to

accept distributors with which other manufacturers had been unwilling to deal—To–Am, for example. (Actually MCFA's predecessor signed the contract with To–Am; for the sake of brevity I refer to both corporations as MCFA.) To–Am's sales and service operations slowly grew, though not without reverses, until February 1994, when MCFA terminated To–Am's distributorship. MCFA apparently sought to consolidate its distribution network. It terminated three distributors in northern Illinois and assigned their territories to a single, larger, more established dealer. The contract permitted this step. Either side could terminate, without cause, on 60 days' notice; if MCFA exercised this right, it was required to repurchase the dealer's unsold inventory.

 MCFA fulfilled its contractual obligations. Nonetheless, To–Am insists, the Franchise Disclosure Act prevented MCFA from availing itself of the rights granted by the contract, and entitles it to damages representing the profits it could have earned had it remained a Mitsubishi dealer indefinitely. Termination of a franchisee must be supported by "good cause", 815 ILCS 705/19(a), and contracts at odds with the statutory scheme are ineffectual, 815 ILCS 705/41. To establish that it was a franchisee, To–Am had to demonstrate by a preponderance of evidence that it paid a franchise fee exceeding $500 "directly or indirectly for the right to enter into [the] business". 815 ILCS 705/3(14), and that it operated the business pursuant to a marketing plan that MCFA prescribed or suggested. MCFA contends that the evidence presented at trial did not permit the jury to reach either conclusion under a correct interpretation of Illinois law. (A third requirement, that "the operation of the franchisee's business ... [be] substantially associated with the franchisor's trademark," 815 ILCS 705/3(1)(b), is uncontested.)

 1. Before trial began, I ruled that any sums To–Am was required to pay for parts and repair manuals must be treated as franchise fees under the statute, in light of 14 Ill. Admin. Code § 200.105(a), which reads: "Any payment(s) in excess of $500 that is required to be paid by a franchisee to the franchisor or an affiliate of the franchisor

constitutes a franchise fee unless specifically excluded by Section 3(14) of the Act." The statutory exceptions cover items a dealer purchases for resale, 815 ILCS 705/3(14)(f), but not items that it will use to conduct the business. To–Am did not purchase service and parts manuals for resale. MCFA insists that the regulation is invalid, as inconsistent with the statute, to the extent it counts payments made for articles that are useful in the conduct of the business and are worth the price paid.

MCFA's argument has logical force. A required purchase at a price exceeding the item's value has the same effect as a cash transfer. A franchisor would be indifferent between receiving a "fee" of $1,000 and a "price" of $1,001 for a rabbit's foot that cost $1 to supply. So a dealer required to buy a decal for $1,000 has paid a franchise fee of $1,000. The statute tries to identify required purchases that produce such a transfer, but the resale condition may be a poor proxy. Suppose repair manuals for Mitsubishi forklift trucks were available from independent suppliers (as manuals for many cars and trucks are), and sell for the same price MCFA charges. Then payments for manuals could not be disguised fees whether or not the dealer planned to resell the manuals (and the dealer's ability to obtain the manuals from an independent source would mean that purchase from MCFA was not "required"). See 815 ILCS 705/3 (14)(c) (excluding from the definition of a franchise fee "the purchase or agreement to purchase goods for which there is an established market at a bona fide wholesale price"). If MCFA charges for the manuals the same price it *would* charge in competition, then it cannot be using the manual requirement to collect an implicit fee. This sets up MCFA's argument: for all the evidence reveals, MCFA charged no more than its cost, and the manuals were worth their weight in gold to To–Am.

Yet all rules make some rough cuts. The Attorney General of Illinois—by promulgating a regulation under explicit statutory rule-making authority—has confined the exceptions to those in the statute. 14 Ill. Admin. Code § 200.105(a), authorized by 815 ILCS

705/32. The statute in turn says that all required payments to a manufacturer are franchise fees, unless covered by an exception. It uses opportunity to resell, rather than some relation between price and cost (or value), as the device to identify implicit franchise fees. In many cases the proxy will be a good one. Another of the exclusions from the definition of franchise fees—"the payment for fixtures necessary to operate the business" (815 ILCS 705/3(14)(d)—implies that payments for consumables are included as franchise fees if they do not meet the retail-sale exclusion in § 705/3(14)(f)). No state court has held or even suggested that the regulation confining the exceptions to those in the statute is invalid, and sitting in diversity I am most reluctant to declare a state administrative regulation invalid without any reason to believe that the state judiciary would find it so.

MCFA's principal argument—that the price for required purchases is not a fee "for the right to enter into [the] business" if the dealer can use the purchased goods to recoup what it pays for them—does not hang together. That the purchases may be worth the asking price may show that the price is not a disguised "fee"; it has nothing to do with whether the payment is "for the right to enter into [the] business". Moreover, when considering this issue before trial I concluded that MCFA had forfeited any challenge to the validity of the state regulations by ignoring them (despite To–Am's heavy reliance on them) until after I had issued my decision. Until then, it relied almost exclusively on *Wright–Moore Corp. v. Ricoh Corp.,* 908 F.2d 128 (7th Cir.1990), a case interpreting the franchise law of Indiana (and by relying on cases decided under Wisconsin law). *Wright–Moore* does not concern the validity of regulations issued under Illinois law. Arguments first raised in a motion for reconsideration, I stated, came too late. I remain of that view, and therefore will apply the regulations as written.

■ 2. Understood in the light most favorable to the verdict, the evidence shows that To–Am paid $1,658.75 for parts and service manuals that MCFA commanded it to possess. The requirement came from the part of the dealership agreement that obliges each dealer to maintain an adequate supply of manuals, so that it can repair the fork-lift trucks as it promised MFCA it would do. Agreement Art. III.14. Nonetheless, MCFA insists, the purchase of manuals was not "required" for purposes of Illinois law, for two reasons. First, MCFA provided To–Am with one free copy of (almost) every manual as it was issued or updated and deemed one to be sufficient under the contract; second, if To–Am concluded that it needed more, it could have made photocopies or bought the manuals from other dealers, and it was never required to buy from MCFA.

Richard Todd and two other former Mitsubishi forklift dealers testified that MCFA did not send free copies of every new manual automatically. MCFA says that only the managers of the dealerships parts and service department would know this, and that the testimony of Todd and the other two owners therefore must be discounted. Weighing testimony is, however, for the jury rather than the court. The jury had a basis from which it could reach a reasoned conclusion that To–Am had to purchase some of the new manuals, the testimony of Kenneth Van Hook (MCFA's employee responsible for sending out its new manuals) to the contrary notwithstanding. What is more, the jury also rationally could have concluded that in order to provide good service—which MCFA required every dealer to do—a dealer needed more than one copy of some service manuals. Van Hook testified that in MCFA's view one copy was enough, but he did not explain how this could be so (and did not assert that this view had been conveyed to To–Am before the litigation commenced) other than to say that the manuals matter most for major work, which is done at the service department. Yet To–Am operated a number of vans that visited customers' premises to provide on-site service: it is easier to get a van to a broken forklift than a broken forklift to the dealer. Todd testified that the mechanics in roving vans need service manuals in order to improve the quality of their work. This meant that the jury could find one manual to be insufficient—and anyway manuals could be lost, or become dirty, and need to be replaced.

Copying manuals, and buying them from other dealers, remained options, but not the kind of options that took the acquisitions outside the scope of the statute and regulations. Copying poses copyright problems. Although MCFA's witnesses testified that they knew that some dealers copied manuals, and did not object, this is some distance from evidence establishing that MCFA told dealers so, or furnished written licenses to copy. None of the manuals contains a disclaimer of copyright, so none was in the public domain; to copy them lawfully, dealers needed the permission of the copyright proprietor. MCFA could have supplied that permission (by language in the manuals themselves, if need be), but the evidence is devoid of record that it did so—and failing to enforce one's statutory right to prevent copying cannot be equated with a grant of permission to make copies. As for the possibility that To–Am could have purchased manuals from another dealer: this is legally irrelevant. Suppose MCFA required every dealer to have a Mitsubishi decal on every service van, and listed these decals in its catalog for $1,000 apiece. For reasons already given, this $1,000 would be an implicit franchise fee. That Dealer *A* could buy a supply of decals and resell them to dealers *B* and *C* would not change the nature of the transaction: so long as MCFA remained the sole source of the decals, each would represent a franchise fee of $1,000 from both its and the dealer's perspective. (In the terms of the statute, there cannot be "an established market at a bona fide wholesale price," 815 ILCS 705/3(14)(c), unless there are at least two different original sources.)

3. Despite all of this, I confess to substantial doubt that To–Am paid a $500 franchise fee within the meaning of Illinois law. My reservations have a source different from MCFA's arguments. Suppose MCFA required each of its dealers to pay $250 per year for a decal bearing its trademark, the year, and the words "Authorized Dealer." Each payment would be a franchise fee; but would the stream of payments aggregate? In other words, does the statute require a fee of $500 over the life of the dealership, or $500 up front (or in the first year)? Unless payment comes at the outset of the dealer-

ship, how can it satisfy the statutory requirement that the fee be paid "for the right to enter into [the] business"? 815 ILCS 705/3(14). If a dealer starts business in Year 1 having paid only $250 for the decal, in what sense is a fee of $500 charged for the right to *enter into* the business? The dealer can quit at year's end without paying a cent more than $250.

Evidence in this case, even taken in the light most favorable to To–Am, shows that the total paid for service and parts manuals did not exceed $500 until several years after the dealership opened its doors. Indeed, it did not exceed even $100 before the state legislature increased the qualifying fee from $100 to $500. Because To–Am did not become a "franchisee" under the first version of the statute, I ruled before trial that it had to qualify under the amended version. It took eight years for To–Am to make $1,658.75 in required purchases (and this is To–Am's calculation; MCFA believes that the number is much lower). For about half of its time as a Mitsubishi distributor To–Am was not a "franchisee" even by its own understanding. Suppose a dealer pays $10 annually for manuals. Can it really be that this dealer is a mere "distributor" in years 1 to 49, and turns into a "franchisee" in year 50? That is the implication of To–Am's position, which I find hard to reconcile with the statutory text. Even the possibility that the fee may be charged for the right, not to enter into the business, but to "engage" in the business, § 705/3(1)(c), just poses the question: "engage for how long"? A year is the customary accounting period in tax law; what is the accounting period under the Franchise Disclosure Act?

Both sides of this litigation have proceeded on the assumption that the $500 threshold can be met by payments accumulating over a decade. Parties may litigate such issues as they please; I am not disposed (and likely am not authorized) to enter judgment on a ground MCFA has never urged, and which To–Am has not had occasion to address. The propriety of cumulation has become the law of this case. Cf. *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 675 (7th Cir.1985). So I put doubts

aside and conclude that the jury was entitled to find that To–Am was required to, and did, make purchases exceeding $500 that constituted an implicit franchise fee.

4. To–Am also needed to show that it had been "granted the right to engage in a business of offering, selling, or distributing goods or services, under a marketing plan or system prescribed or suggested in substantial part by a franchisor". 815 ILCS 705/3(1)(a). MCFA allows that a jury could properly find that from the beginning it supplied To–Am with assistance and suggestions about advertising, signage, demonstrations of its trucks, and trade show exhibits. But it contends that these elements are insufficiently comprehensive to be a "marketing plan or system" and that it never required To–Am to follow its suggestions or otherwise assume control of the way in which To–Am ran its business and presented itself to the public. MCFA asked me to instruct the jury that "[i]f it did not *require* To–Am to follow the plan or system, you must find that MCFA did not grant To–Am" a franchise (emphasis added). I declined to give this instruction, and MCFA now asks me to hold a second trial at which such an instruction would be used. (I do not understand MCFA to argue the sufficiency of the evidence independent of its contention that the jury should have been charged as it proposed.)

Section 705/3(18) contains this definition:

"Marketing plan or system" means a plan or system relating to some aspect of the conduct of a party to a contract in conducting business, including but not limited to (a) specification of price, or special pricing systems or discount plans, (b) use of particular sales or display equipment or merchandising devices, (c) use of specific sales techniques, (d) use of advertising or promotional materials or cooperation in advertising efforts; provided that an agreement is not a marketing plan or system solely because a manufacturer or distributor of goods reserves the right to occasionally require sale at a special reduced price which is advertised on the container or packaging material in which the product is regularly sold, if the reduced price is absorbed by the manufacturer or distributor.

From this language it is plain that advice about how to run the business need not be comprehensive in order to amount to a "marketing plan". See *Blankenship v. Dialist International Corp.*, 209 Ill.App.3d 920, 154 Ill.Dec. 503, 568 N.E.2d 503 (5th Dist.1991) (Harrison, J.); *Salkeld v. V.R. Business Brokers*, 192 Ill.App.3d 663, 139 Ill.Dec. 595, 548 N.E.2d 1151 (2d Dist.1989). MCFA is content with the possibility that a manufacturer's "plan" will be skeletal; to show that dealer sells "under" the plan, however, the dealer must establish that the plan is obligatory, MCFA submits. This is not, however, what the statute says. Section 705/3(1)(a) is satisfied when the dealer has the *right* to sell under a marketing plan. See *Blankenship*, 154 Ill.Dec. at 506, 568 N.E.2d at 506. One may have the right to use a plan without having a duty to do so. The regulations make this point explicit. "A marketing plan or system may be prescribed or suggested in substantial part regardless of whether the franchisee is an independent contractor and not the agent of the franchisor and notwithstanding provisions of a franchise or other agreement purporting to grant the franchisee complete freedom in operating its business." 14 Ill. Admin. Code § 200.102(c). MCFA observes that this regulation does not address the effect of the statutory word "under", which is true enough but beside the point, once effect has been given to the statutory word "right". The instructions correctly stated the law of Illinois.

MCFA had means to prevent To–Am from becoming a franchisee. For example, it could have furnished manuals for free (more accurately, could have included the cost of manuals in the wholesale price it charged for the forklift trucks, rather than charging separately). MCFA alternatively could have granted its dealers express permission to copy the manuals. Perhaps MCFA never suspected that the dealership could be called a "franchise," because corporate counsel did not consider the possibility of implicit franchise fees. Most states that have enacted franchise laws treat implicit transfers—supracompetitive prices for required purchases, excess-inventory requirements, and the like,

see *Digital Equipment Corp. v. Uniq Digital Technologies, Inc.,* 73 F.3d 756 (7th Cir. 1996)—as equivalent to explicit franchise fees. This is economically sound in principle, but manufacturers must beware the administrative shortcuts to the identification of these implicit fees. MCFA did not appreciate how wide a net Illinois casts. What remains to be determined is the price it must pay for this miscalculation.

## II

■ MCFA contends that the award of $1.525 million in damages is too speculative. It fits comfortably within the range marked out by To–Am's expert Fred Lieber, who calculated damages between $2.2 and $2.6 million, and MCFA's expert Seth Palatnik, who preferred a range of $0 to $36,000. Illinois law supplies the substantive standard, compare *Gasperini v. Center for the Humanities, Inc.,* —— U.S. ——, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996), with *Mayer v. Gary Partners & Co.,* 29 F.3d 330 (7th Cir.1994), and Illinois permits a trier of fact to split the difference when the parties' estimates are so disparate. See *F.L. Walz, Inc. v. Hobart Corp.,* 224 Ill.App.3d 727, 167 Ill.Dec. 42, 586 N.E.2d 1314 (3d Dist.1992). Unless something is grievously wrong with Lieber's calculations, the award must stand. That Lieber predicted profits for To–Am far in excess of those it had previously achieved is not a fatal defect. Some businesses grow slowly for a while and then take off; Lieber gave reasons for believing that To–Am would have been such a firm, had MCFA not pulled the plug. Cf. *Lapinee Trade, Inc. v. Boon Rawd Brewery Co.,* 91 F.3d 909 (7th Cir.1996) (holding that lost-profit damages are legally possible even when records show that the plaintiff was losing money, because an expert can predict, and a jury conclude, that a turn-around is in prospect); *Mid–America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1365–69 (7th Cir.1996).

Lieber attempted to predict the sales To–Am would have achieved, and the profits it would have made, had it remained a Mitsubishi dealer. He capitalized the value of these profits and subtracted the value of To–Am's assets at the end of December 1993, shortly before the termination. The difference between the two was his estimate of damages. Because To–Am showed losses without its Mitsubishi dealership, Lieber concluded that its asset value exceeded any plausible projection based on future profits. MCFA contends that this was inappropriate—that having used a discounted-profits approach for To–Am with a dealership, Lieber should have used the same approach for To–Am without. A jury could conclude that Lieber had a reasonable basis for making the distinction: the one he gave on the stand, To–Am's red ink without the dealership, which made it worth more dead than alive and justified the use of an asset valuation. For what it is worth, I think this approach favorable to MCFA. Palatnik attempted to value the stream of profits To–Am could expect without the Mitsubishi dealership and came up with $128,400 as of December 1993, substantially less than Lieber's asset valuation of $241,700. MCFA is fortunate that To–Am did not embrace this aspect of Palatnik's testimony and ask the jury for an extra $113,300. (Palatnik's calculations implied that Richard Todd, To–Am's owner, should have closed To–Am long before 1993, because he could get more for its assets than he would earn by using them to run a dealership. A jury reasonably could have concluded that Todd is not such a fool, and that the problem lay with Palatnik's approach.)

Most of MCFA's remaining arguments about damages boil down to disagreement with Lieber's projections of To–Am's sales. MCFA is particularly put out by the projection that To–Am would have sold 600 forklift trucks to Carpetland, which before To–Am was cut off had never purchased a single new forklift truck from that dealership. Lieber was of course aware that MCFA would lay into this prediction, and that the jury might receive it with skepticism, so he calculated alternative futures for To–Am in which Carpetland did not play a role. The jury awarded To–Am less than Lieber's lowest calculation that omitted Carpetland, so I do not see how the uncertainty of the Carpetland prediction mattered. The jury evidently disregarded it.

What makes Lieber's work look fishy to MCFA (and to me) is that Lieber projected a period of spectacular growth for To–Am, some 50% per year, compounded for five years before the dealership reached its new steady state in 1998. How likely is that? For To–Am to grow this fast, everything would have had to fall in its favor. Some dealerships reach the size Lieber projected. Data from the Materials Handling and Equipment Dealers' Association (MHEDA), a trade association of forklift and related firms, show that many dealers have the gross sales Lieber predicted for To–Am. But do they grow so fast? Has *any* dealer *ever* grown so fast? What are the profit margins (either median or maximum) of the largest dealers? Palatnik had access to MHEDA data. But instead of tapping the original database, Palatnik contented himself with a summary publication that does not answer these questions. It gives median gross operating margins, for example, but does not show the range of profitability achieved in the industry. Palatnik also did not conduct a detailed analysis of Lieber's projections. Instead he simply asserted that To–Am's future would be like its past; and to the extent To–Am's future differed from its past, then To–Am would be exactly like a normal (which is to say, median) forklift dealer, growing at the industry's aggregate rate and experiencing the industry's median profits. That enabled Palatnik to conclude that To–Am lost very little—that, indeed, MCFA may have done it a favor—but did not enable Palatnik to say anything of much value.

It would have been more interesting had Palatnik gone to the MHEDA database and asked the question how profitable is the most profitable firm with the sales Lieber projected for To–Am. Or Palatnik might have asked whether firms that grow as fast as Lieber predicted for To–Am increase their gross margins (as Lieber thought To–Am would do) or find that margins shrink—perhaps because dealers shave their prices, and thus their margins, in order to achieve growth at the expense of other local dealers, who are not going to roll over and give up. Palatnik stated confidently that growth could be achieved only by reducing margins, but he never put this question to an empirical test,

and the jury therefore was entitled to disregard his conclusions. Evidently it did.

Lieber's combination of projecting a cash flow (discounted to present value) with his assumption about rapid, compound, growth, was responsible for the substantial award of damages. His methodology has been subject to criticism for its flexibility; a skilled practitioner can come up with just about any value he wants. See *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826 (7th Cir.1985); *Boxhorn's Big Muskego Gun Club, Inc. v. Electrical Workers*, 798 F.2d 1016, 1022–23 (7th Cir.1986); Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* 62–66, 191–96 (3d ed.1988). See Lucian Arye Bebchuk & Marcel Kahan, *Fairness Opinions: How Fair Are They and What Can Be Done About It?*, 1989 Duke L.J. 27, 35–37. But Palatnik did not question two of the most important variables in Lieber's analysis: the rate of interest (which determines how the cash streams are reduced to present value) and the profit margin on sales. He was content to snipe at the projected growth rate.

Yet the cor of Lieber's analysis was open to attack; indeed, it strikes me as fantastic. His analysis imputes to To–Am a price-earnings ratio of 249 at the end of December 1993! (This is the value Lieber calculated for the business, divided by its 1993 earnings.) How did this come about? Although Lieber projects growth of approximately 50% per year, compounded, for four years, with more modest increases thereafter, he predicts a *reduction* in To–Am's costs of doing business (other than its costs of goods sold). A business grows at a startling rate without new capital?!? Yet Lieber projects To–Am's costs of capital as steadily declining. Even if Todd financed the business out of his own pocket, To–Am the corporation would have shown interest on that borrowing, which would have been necessary to pay for the extra inventory and to expand the repair department. A business quintuples its size in a few years, and repairs what it sells (repairs are a vital profit center for a forklift dealer), yet needs fewer man-hours in the service department?!? Again, this is what Lieber's projected pro forma balance sheets show. Lieber's calculation of net profits was

driven by these cost-reduction assumptions. Had To–Am grown like topsy, yet maintained its historic profit margins, the loss from termination of the dealership would have been less than $300,000. Lieber's projected balance sheets impute to To–Am profit-to-revenue ratios exceeding 10%, compared with an industry median of less than 2%. Has any forklift dealer in the history of the United States achieved such a profit ratio? It is hard to believe that MCFA would see its dealers reaping such margins—for dealers' profits are manufacturers' costs—and not raise the price of its forklift trucks to appropriate some of the gain for itself.

The only thing more farfetched than Lieber's projected balance sheets is the fact that Palatnik, MCFA's other witnesses, and MCFA's lawyers, simply ignored their details. Neither at trial nor in the post-trial motions papers has MCFA said one word about Lieber's cost entries. MCFA was fixated at trial on the predictions of gross revenues. It missed, and continues to miss, the fact that the damages calculations are dominated by To–Am's projected *net* income, not gross income, and that the net income figures were driven by Lieber's cost-reduction assumptions. Lieber did not explain at trial the reasoning behind these assumptions. Perhaps he could have given a reason, but MCFA never called on him to do so, and Palatnik likewise ignored the subject. He did not discuss net income other than to say that margins in the business are low. Doubtless this is true; the MHEDA figures say as much; but Lieber insisted that To–Am would be a special case, and MCFA never tried to grapple with the approach that led to this conclusion.

Other methods of valuation went unexplored. For example, neither side produced evidence about the selling price of comparable dealerships. Lieber's approach—based on Todd's testimony that dealerships of a certain age have developed customers and tend to grow rapidly—implies that the price-earnings ratio of dealerships sold after eight or so years will be especially high (and that dealerships between 9 and 14 years of age grow especially fast); yet no one introduced evidence from comparable sales or the MHE-DA data to validate or refute this proposition. If To–Am had grown at the high rate Lieber predicted, then by 2000 To–Am would have made almost all the forklift sales in its area of primary responsibility, wiping out local dealers for other brands. (Todd testified that in 1993 To–Am made between 12% and 14% of all forklift sales in his five-county area.) Does this happen, anywhere in the country? Again the MHEDA data would be telling; again neither side consulted them.

In sum, MCFA tried to persuade the jury that, for To–Am, the future would be like the past, and like the industry norm. When the jury did not agree, there was nothing left to turn to except Lieber's estimates—estimates the questionable details of which were not explored at trial. MCFA played a risky strategy and lost. It is not the proper function of the court to cut down the victor's damages because of beliefs about whether another strategy was available. *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1342 (7th Cir.1988). Perhaps Lieber would have had answers to my doubts. Because MCFA did not press him, he never had a chance to respond. On this record, the jury's verdict must stand.

### III

1. To–Am asks me to add more than $500,000 in attorneys' fees to the jury's verdict. Its authority is 815 ILCS 705/26 ¶ 5: "Every franchisee in whose favor judgment is entered in an action brought under this Section shall be entitled to the costs of the action including, without limitation, reasonable attorney's fees." To–Am's lawyers devoted 1640 hours to the case, which at the rates normally charged by these lawyers comes to $234,482. According to To–Am's law firm, the value of these lawyers' services is 20% more than their actual billing rates, producing an appropriate bill of $284,058. To reach $500,000, To–Am argues alternatively that it should receive a risk multiplier of 2, or that the award should be based on its contingent-fee agreement with counsel, under which it agreed to pay one-third of any judgment obtained at trial (40% of the award, if MCFA should appeal).

Federal law contains many fee-shifting provisions similar to § 705/26, and evaluation of To–Am's request under these provisions would not be difficult. After *Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), multipliers for the risk of nonpayment are never appropriate when calculating the amount of fees to be imposed on the losing litigant (although they may remain appropriate when determining how much a lawyer may collect from his own client, or from a common fund representing the interests of a class). See *Barrow v. Falck*, 977 F.2d 1100, 1105 (7th Cir.1992). The risk multiplier of 2 and the contingent-fee agreement (another way of awarding a multiplier for the risk of non-payment) therefore would be inappropriate. Enhancing the lawyers' hourly rates by 20% likewise would be out of the question. The award depends on the market rate for legal services, and that means the price the lawyer actually charges, or at which the client could hire equivalent legal services in the market. Compare *Central States Pension Fund v. Central Cartage Co.*, 76 F.3d 114 (7th Cir. 1996), with *Gusman v. Unisys Corp.*, 986 F.2d 1146 (7th Cir.1993), and *Barrow*, 977 F.2d at 1106. See also *Cooper v. Casey*, 97 F.3d 914 (7th Cir.1996); *Pressley v. Haeger*, 977 F.2d 295 (7th Cir.1992); *In re Continental Illinois Securities Litigation*, 962 F.2d 566 (7th Cir.1992). To–Am's law firm originally agreed to represent To–Am at its standard hourly rates. It is these rates, rather than the actual rates plus a 20% premium, that represent the real market for the legal services To–Am received. Every law firm would like to think that its services are worth more than its fees, but if the *clients* thought that, the lawyers could increase their rates. Awards of fees depend on actual behavior in the market, rather than lawyers' wishful thinking. The award under federal law therefore would be $234,482, less any deductions of the kind discussed below.

According to To–Am, Illinois does not follow *Dague* and permits a court to augment an award for the risk that the litigation will not succeed. The evidence for this, To–Am believes, is that *Blankenship*—the only appellate decision that has discussed attorneys' fees under § 705/26—stated in passing that "the contractual fee arrangement between attorney and client" is something a court may consider. 154 Ill.Dec. at 507, 568 N.E.2d at 507. *Blankenship* predated *Dague*, and it looked to the federal approach for guidance—an approach modified by *Dague*. No state court has said a word about § 705/26 since *Dague*. What is more, *Blankenship* did not require a court to use a contingent-fee contract as the proper measure of the market rate; it was rather more cautious, stating that the agreement is "but one factor" bearing consideration. Only one state decision has cited *Dague:* the Supreme Court of Illinois, in *Brundidge v. Glendale Federal Bank, F.S.B.*, 168 Ill.2d 235, 213 Ill.Dec. 563, 568–69, 659 N.E.2d 909, 914–15 (1995). In an opinion joined by the author of *Blankenship* (by then serving on the state's highest court), the court distinguished fee-shifting from common-fund cases and held that a court may assess fees at a percentage of the recovery only in the latter—that is, only when the attorney's clients pay, through a diminution of the common fund. The court implied agreement with *Dague* for fee-shifting cases, but did not make this explicit. Nothing in the text of § 705/26 suggests that Illinois wanted to adopt a rule different from the federal approach to fee-shifting statutes, and the parties have not identified any legislative history that sheds light on the subject. I therefore predict that, when the time comes, the Supreme Court of Illinois will follow the approach used in federal litigation (like that of other nations that require losers to pay) and abjure the use of risk multipliers when assessing fees against losing litigants.

Read most favorably to To–Am, *Blankenship* means at most that a court may, but need not, consider a contingent-fee contract when determining the appropriate award of fees. Even if this survives *Dague* (as I think it does not), the contract between To–Am and its law firm lacks significance here. This is not a tort case, in which the contingent-fee contract is the market's normal method of compensation. Ours is commercial litigation, usually conducted on an hourly-fee basis. So this case began. To–Am agreed to pay the law firm at its usual hourly rates. After a year To–Am fell be-

hind in payments. Rather than drop the client, the law firm agreed to continue on contingent fee. As its papers make clear, such an agreement was unusual, contrary to the firm's wishes and normal practice. The law firm effectively became To–Am's lender of last resort. Difficulties unique to a particular plaintiff or case do not justify imposing extra costs on defendants, however, for reasons discussed in *Dague* and its predecessor *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). MCFA's responsibility is not increased by the difficulties To–Am encountered in financing the litigation. So I will use the firm's regular hourly rate, multiplied by the number of hours, as the benchmark (or "lodestar") from which to proceed, just as law firms and clients do in ordinary commercial cases.

▇▇▇▇ To–Am prevailed fully in this litigation; indeed it secured a larger judgment than it had any right to expect (and substantially larger than it sought in a settlement offer sent to MCFA in February 1996). Success justifies a full award of fees. Nonetheless, MCFA wants me to cut down on the allowable hours, because some of To–Am's theories fell by the wayside. It contended, for example, that four kinds of transactions yielded implicit franchise fees, and my order of July 8, 1996, removes three of these theories from the case. Yet under the federal approach to fee shifting statutes, which I think Illinois will follow, the pursuit of multiple legal theories in support of a single claim for relief does not imply a need to win on each legal theory in order to collect a fully compensatory fee. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Lenard v. Argento*, 808 F.2d 1242 (7th Cir.1987). Only failure on a discrete claim for relief justifies paring hours from the lodestar.

▇▇▇▇ On some claims To–Am did fail. Chief Judge Aspen dismissed claims against several defendants, To–Am dismissed its claim against Gilbride, the jury rejected To–Am's claim against Wagner, and To–Am voluntarily dropped some of its theories against MCFA. But as far as I can see, none of these theories affected by one cent the damages

To–Am was entitled to, and did, recover. Their abandonment simplified the litigation, and MCFA should give thanks for the reduction in the legal fees it now must bear. Although these were styled "claims" in the complaint, they were more like theories in support of a single, and ultimately successful, claim. Time spent pursuing the individual defendants is not compensable in the suit against MCFA, but it seems unlikely that any significant blocks of time are allocable to the claims against Gilbride, Wagner, and the other defendants dismissed earlier in the case. MCFA conducted a minute survey of the billing records submitted with To–Am's motion and did not attribute any particular time to the inclusion of the individual defendants.

What plainly cannot be assessed against MCFA is time To–Am spent defending against MCFA's counterclaim for the price of trucks and parts it delivered to To–Am, and for which To–Am did not pay until mid-way through this litigation. Chief Judge Aspen entered summary judgment for MCFA on this counterclaim; yet To–Am had the gall to submit a bill under § 705/26 for *its* legal expenses in attempting to avoid payment. According to MCFA, the billing records show that 124.25 hours of legal time, at the cost of $16,139.25, were devoted to To–Am's unsuccessful defense of the counterclaim. (MCFA objects to 39.35 hours by Gary W. Leydig at $185 per hour, 83.9 hours by Robin Hoberman at $105 per hour, and 1 hour by Steven L. Wiser at $50 per hour.) It asks me to require To–Am to bear this expense itself. To–Am replies that MCFA has been rather generous to itself in counting hours. Any block of time with multiple notations was allocated entirely to the defense of the counterclaim. Leydig billed six hours to To–Am on February 16, 1996, with this notation: "Finalize our reply memorandum in support of motion to stay judgment [on the counterclaim]; legal research re: franchise act (fee/marketing plan/damages), prepare for Houston depositions; telephone conferences with Mr. Todd." MCFA allocated all six hours to the defense of the counterclaim, which is absurd.

■ What to do? MCFA has made an extravagant demand for exclusion, but To–Am has not responded with a breakdown of hours that would enable me to exclude those devoted to the counterclaim. Even the principle that doubts should be resolved against the person bearing the burden of persuasion (on this issue, To–Am, which wants the award) does not help much, because To–Am has established from the billing records that it is entitled to *some* of the time that MCFA wants me to exclude. For want of a better solution, I shall exclude half of the time to which MCFA objects. My best guess (no more than that, really) is that this is favorable to MCFA. To–Am had no defense to the counterclaim, and it was unlikely to have spent much legal time trying to defend the indefensible. The counterclaim sought approximately $76,000; a legal bill to To–Am representing even a small fraction of this would have been unreasonable. If either side thinks that the billing records permit a more precise resolution of this conflict, I will be happy to receive supplemental submissions or arguments. (Because this is the initial decision on To–Am's request for attorneys' fees, either side may file a motion under Rule 59 within 10 days.) For now, however, I subtract $8,070 from To–Am's request and award it the balance, $226,412, as the legal fees allowed by 815 ILCS 705/26 ¶ 5.

One final note: What I have determined here is how much MCFA, the loser in the litigation, must chip in toward To–Am's legal expenses. The contingent-fee contract between To–Am and its law firm is valid and enforceable. The law firm supplied valuable financing and risk-bearing services for which it is entitled to the agreed compensation. Conclusions about the amount of legal fees that may be shifted to one's adversary do not affect the amount the client must pay under its contract.

2. As To–Am sees things, § 705/26 requires the court to award not only legal expenses but also all other outlays—costs "in the typical sense used by lay persons—i.e. the money spent (all money spent) to obtain a judgment." Petition for Attorneys Fees and Non–Taxable Expenses at 12. The principal item for which To–Am wants compensation under this heading is the $41,393 paid to Lieber, its accounting expert. About $2,000 of this amount is taxable as statutory costs or witness fees; To–Am believes that § 705/26 entitles it to the rest.

■ Although a prevailing franchisee is entitled to "the costs of the action including, without limitation, reasonable attorney's fees", the words "without limitation" do not create any extra entitlement. An award of attorneys' fees does not *preclude* (= limit) any other item of costs; the statute does not say that there is to be no limitation on what the prevailing party may claim as costs. Experts' fees differ from both traditional "costs"—a closed statutory list, see *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987); *Collins v. Gorman*, 96 F.3d 1057 (7th Cir. 1996)—and attorneys' fees. So much is clear under federal law. Unless the statute expressly authorizes the shifting of expert-witness fees, the parties must bear their own. *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991); *Bankston v. Illinois*, 60 F.3d 1249, 1257 (7th Cir.1995). The franchise law does not mention experts' fees, and I could not find any case holding that, for purposes of Illinois law, a statute similar to § 705/26 authorizes an award of expert-witness fees. Once again, therefore, I anticipate that the Supreme Court of Illinois will construe § 705/26 the same way the Supreme Court of the United States construes federal fee-shifting rules. To–Am must bear Lieber's fees to the extent they exceed the costs and witness fees allowed by 28 U.S.C. §§ 1821 and 1920.

■ Remaining outlays for which To–Am seeks reimbursement from MCFA are compensable as "attorneys' fees." This term includes not only work performed by members of the bar but also the costs of other inputs into legal services—paralegal time, secretarial work, libraries (and computer-aided legal research), travel expenses, and the like, the sort of things that a lawyer includes on a bill for professional services. *Missouri v. Jenkins*, 491 U.S. 274, 285–89, 109 S.Ct. 2463, 2470–72, 105 L.Ed.2d 229 (1989). To–Am

wants $1,790.25 for temporary legal employees (in lieu of more expensive paralegals or associates), $2,963.83 for computer-aided research, $475.01 for disbursements to a New York law firm, $62.72 for telephone charges, $2,520.42 for deposition-related travel expenses, and $595.32 for messenger and delivery services. These are ordinary and appropriate elements of the bills lawyers submit to paying clients, and the total of $8,407.55 is allowed. (MCFA does not contend that any of these expenses was incurred unreasonably. It complains that the documentation does not establish that each of these expenses was "necessary" or even "indispensable" to success in the litigation, but this is not the legal standard for fee-shifting.)

3. Finally there are statutory costs, including the munificent witness fee of $40 per day. MCFA has submitted a fussy response, complaining about the lack of documentation, the different cost per page of deposition transcripts, and so on. To–Am wants compensation for thousands of pages of photocopies; where, MCFA inquires, did each page go? This is not a sound response. It would cost more to document such matters than it costs to assemble and pay the photocopy bill. Does MCFA really want a paralegal to sit down and do this work—given that the paralegal's fee would be shifted back to MCFA under § 705/26? The volume of photocopying seems to me entirely appropriate in light of the nature of the litigation. On another front: Outlays for deposition transcripts are recoverable as costs notwithstanding the fact that not all of the witnesses testified; a cost may be reasonably incurred without leading to live testimony.

MCFA did find some arithmetic problems in the bill of costs. These To–Am corrected in an amended bill of costs. And MCFA is right that To–Am cannot collect the costs it incurred in serving process on defendants ultimately dismissed from the suit. It is entitled to the costs of its suit *against MCFA,* not of its claims against other persons. The amended bill of costs dated September 19, 1996, is allowed, except for service fees of $267.80, for a total of $19,893.21 ($20,163.01 less $267.80).

IV

In sum:

1. The jury verdict of $1,525,000 stands; MCFA's motions for judgment, for a new trial, and for remittitur are denied.

2. MCFA must pay To–Am's attorneys' fees (including the items To–Am calls "nonstatutory costs") in the amount of $234,819.55. But Lieber's fees are recoverable only as statutory costs; To–Am's request for expert fees is denied.

3. To–Am recovers costs in the amount of $19,893.21.