In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1107

Joseph D. Olsen, Trustee
of Huntley Ready Mix, Inc.,

Plaintiff-Appellant,

v.

Gary A. Floit,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 99 C 50203--Philip G. Reinhard, Judge.

Argued June 1, 2000--Decided July 14, 2000

  Before Bauer, Easterbrook, and Manion, Circuit Judges.

  Easterbrook, Circuit Judge. In May 1993 Huntley
Ready Mix sold all of its operating assets for
$151,000 to Harvard Ready Mix. This plus cash on
hand was just enough to pay off Huntley's secured
debt, which had been guaranteed by Gary Floit,
Huntley's founder, president, and principal
shareholder. Huntley retained its accounts
receivable, eventually collecting and
distributing about $100,000 to its general
creditors, but another $200,000 or so remained.
When Huntley filed a petition under Chapter 7 of
the Bankruptcy Code of 1978 its only asset was
some $125,000 owed by deadbeats. As part of the
transaction, Harvard hired Floit as its plant
manager under a three-year employment contract
(at approximately the salary he drew from
Huntley) and paid $249,000 for a five-year
covenant not to compete in the concrete business.
Huntley's trustee believes that Huntley's assets
were worth at least $400,000, more than enough to
pay off its debts, and that Floit diverted to
himself under cover of the no-compete agreement
the value of the unsecured creditors' interests.
If so, then Huntley "received less than a
reasonably equivalent value in exchange for [the]
transfer". 11 U.S.C. sec.548(a)(1)(B)(i). As
events revealed that Huntley either was insolvent
when the sale occurred or became insolvent as a
result, the transaction may have been a

fraudulent conveyance, and the estate might have recovered from Floit as "the entity for whose benefit such transfer was made". 11 U.S.C. sec.550(a)(1). But Huntley entered bankruptcy 15 months after the sale, and sec.548(a)(1) reaches back just one year.

Instead of giving up or arguing that Floit is equitably estopped to take advantage of the time limit in sec.548(a)(1), Huntley's trustee in bankruptcy tried a novel approach: he sued Floit (in an adversary proceeding) under state corporate law on the theory that Floit violated his fiduciary duty to Huntley as one of its directors. The theory is akin to that of a fraudulent-conveyance action--that Floit obtained too little for Huntley and too much for himself-- without the need to show that Huntley was insolvent, and with the benefit of a longer period of limitations under Illinois law. We call this "novel" because the state-law claim is designed to protect shareholders rather than creditors, and the Floit family held all the shares. Under 805 ILCS 5/8.60, the statute in question, a director who receives a personal benefit from a transaction with or by the corporation must demonstrate that the arrangement was "fair" to the corporation, unless either disinterested directors or disinterested shareholders approved the transaction with knowledge of all material facts. This statute-- similar to the 1984 version of the ABA's Model Business Corporation Act sec.8.31--provides that directors and shareholders who do not participate in the transaction are free to approve it, which they will do when it benefits them (or at least does not harm them) as equity holders. Because shareholders acting in their own interests are entitled to approve, 805 ILCS 5/8.60 cannot be a creditor-protection rule. It is passing strange to say that a single minority shareholder with a trivial stake could have approved the sale to Harvard and thus insulated it from any later attack (other than a fraudulent-conveyance action), but that, because there were no minority shareholders in Huntley, approval was impossible. Yet Floit has not picked up on this logical problem in the trustee's invocation of 805 ILCS 5/8.60, forfeiting whatever arguments might be available to terminate the claim on strictly legal grounds. His sole response is that the transaction was indeed "fair" to Huntley. The bankruptcy judge held a trial and agreed with Floit; the district judge affirmed; the trustee now contends that the critical findings were clearly erroneous, an uphill battle. See Anderson v. Bessemer City, 470 U.S. 564 (1985).

Illinois defines "fair" as market value. A transaction is "fair" to a corporation when it

receives at least what it would have obtained following arms' length bargaining in competitive markets. Shlensky v. South Parkway Building Corp., 19 Ill. 2d 268, 283, 166 N.E.2d 793, 801 (1960) (discussing common-law requirement of fairness preceding enactment of 805 ILCS 5/8.60); cf. BFP v. Resolution Trust Corp., 511 U.S. 531 (1994) (a foreclosure sale produces "reasonably equivalent value" for purposes of bankruptcy law). Floit and the trustee produced expert witnesses who estimated the price that Huntley's assets would have fetched in a competitive sale. Floit's expert valued the business (including Floit's services) at approximately $440,000, and the trustee's at $380,000 to $410,000. Floit's expert differed from the trustee's by opining that most of this value was contributed by Floit personally and that the corporation assets were worth $151,000 or less. Floit also offered his own testimony and that of Jay Nolan, Harvard's president, in support of the lower valuation. The bankruptcy judge accepted this view.

Both sides also looked through the other end of the telescope, asking whether the covenant not to compete would have been worth $249,000 in a competitive market--on the sensible theory that if the covenant had been overvalued, then it must have represented a disguised portion of the purchase price for Huntley's assets. Unsurprisingly Floit, Nolan, and Floit's expert all testified that the covenant was worth at least $50,000 per year, for a total of $250,000. This testimony received some support from a disinterested source: when Harvard Ready Mix was itself sold in mid-1996, the buyer paid $200,000 for the two remaining years of Floit's abnegation. Perhaps conditions changed in the cement industry, making the threat of his competition more serious; the question in this litigation is what the covenant was worth in 1993, not what it was worth in 1996; but a $100,000-per-year valuation in 1996 lends verisimilitude to the assertion that in 1993 the covenant was worth at least $50,000 per year. The trustee's expert disagreed, stating that a covenant not to compete in the cement business should be valued at between 0.7 and 1.5 times the promisor's annual earnings, which implies that the value of Floit's covenant could not exceed $93,000 (given his salary of $62,000 during the year preceding sale). The expert conceded that covenants sometimes represent a percentage of a closely held corporation's sales, and that in one case of which he was aware the owner-principal of a closely held firm had received 16% of its annual sales. Applied to Huntley's sales (about $1.5 million in 1992, its last full year of operation), this implied a value of $240,000 for the covenant not to compete, but the trustee's

expert rejected this conclusion as unrealistic for Huntley and Floit. The bankruptcy judge, however, thought it entirely realistic given Nolan's testimony and the $200,000 value later placed on two years of Floit's covenant by parties who had no stake in the outcome of this litigation. That buyer also paid Nolan and his brother (Harvard's two principals) $1.5 million apiece for their covenants not to compete for five years.

Valuation of closely held businesses is something of a black art. Experts try to project the firm's net cash flow into the future, then discount that stream to present value. This process is difficult for public companies, see Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826 (7th Cir. 1985); Richard A. Brealey, Stewart C. Myers & Alan J. Marcus, Fundamentals of Corporate Finance 122-35 (2d ed. 1999); Lucian Arye Bebchuk & Marcel Kahan, Fairness Opinions: How Fair Are They and What Can Be Done About It?, 1989 Duke L.J. 27, 35-37, and almost impossible for private companies, for which uncertainties abound. What was apt to happen to Huntley? The trustee's expert assumed that, if not sold, it would have remained in business and generated about the same cash flows as before; Floit and Nolan testified, however, that Huntley's plant was decrepit and that the expense of renovation could not be justified. Nolan recounted that most of Huntley's equipment had been "hauled off to the junkyard" soon after the acquisition. These two stories implied dramatically different futures for the firm and correspondingly large differences in the present value of its earnings and the price-earnings multiple on sale.

Similarly unclear was how to calculate the firm's real earnings. The trustee's expert calculated that over the last few years before its sale Huntley generated a weighted annual average of $115,000 in "discretionary income," with a high of $166,000 in 1992. "Discretionary income" in this formulation is whatever is left after the costs of paying for all materials and labor, other than Floit's. But it is artificial to assume that the full cost of an entrepreneur's labor is the nominal salary he pays to himself; the entrepreneur also benefits from perquisites of office and changes in the value of the firm's stock. To determine how much Huntley's assets could have fetched in an arms' length sale, it would have been necessary to know the full cost of Floit's services--which is to say his reservation wage, what he could earn in other employment--not just his nominal salary. Sometimes a court can pin down the entrepreneur's entitlement by asking whether what remains adequately compensates minority investors for the

risk they bear, see Exacto Spring Corp. v. CIR, 196 F.3d 833, 838-39 (7th Cir. 1999), but Huntley did not have minority shareholders. Reservation wages, alas, are hard to pin down otherwise, unless perhaps by observing how much Harvard was willing to pay Floit. That answer turned out to be $115,000 per year ($65,000 in salary plus $50,000 as the annual portion of the covenant not to compete). Viewed this way, the numbers imply that Huntley didn't have much if any value beyond its physical assets; its net cash flow was needed to retain Floit's services. (That the "discretionary income" increased to $166,000 in 1992 may do more to show that Huntley had deferred replacing its assets, and thus curtailed its out-of-pocket costs, than to show an improvement in its true economic position. Nor is it dispositive that Harvard paid Floit both for employment and for a covenant not to compete. The latter was independently valuable to Harvard in the event Floit should quit, be fired, or just leave at the expiration of the three-year employment contract.)

When hard numbers are difficult to come by or evaluate, people often rely on reputations. The trustee insists that his expert had better academic credentials and more experience valuing closely held companies than did Floit's, so that the bankruptcy judge should have adopted the estimates of the trustee's expert. A reasonable trier of fact might have proceeded that way, but we cannot say that a contrary view was clearly erroneous. After all, the bankruptcy judge's views do receive support from the $100,000-per-year valuation of Floit's covenant as of 1996. Floit may have been well respected by others in the business, and thus able to attract a substantial package of compensation to deter him from starting a new firm or defecting to another producer. What is more, the trustee's expert did not do all that would be expected of a specialist in valuing closely held firms. Why leap to a discounted cash flow analysis when other methods are available? Most trade associations maintain records of sale prices for firms in the business. What multiple of free cash flow did other small cement ready-mix producers sell for? See To-Am Equipment Co. v. Mitsubishi Caterpillar Forklift America, Inc., 953 F. Supp. 987, 996-97 (N.D. Ill. 1997), affirmed, 152 F.3d 658 (7th Cir. 1998). It would have been especially interesting to know the answer to this question for sales following the departure (or death) of the founding entrepreneur. For although Huntley owned its assets, Floit was not among these. He did not have a long-term contract with Huntley or a no-compete agreement and thus could leave and compete at will. E.J. McKernan Co. v. Gregory, 252 Ill. App. 3d 514, 530-31, 623 N.E.2d 981, 994

(2d Dist. 1993). Floit owned his human capital and was free to withdraw from Huntley and sell his services to a higher bidder without violating any fiduciary duty. For what price could Huntley's plant, customer list, goodwill, and so on have been sold without assurance of Floit's services? That's where price-earnings ratios for firms sold after the death or departure of their founders would have come in handy. The trustee's expert did not attempt to estimate this figure; instead he assumed that whatever value Floit's services produced was "owned" by Huntley and would be capitalized in its sale price. When asked about this at oral argument, the trustee's counsel conceded that his expert had valued Huntley as a going concern with Floit as its manager, adding that Floit's expert had done the same thing and that Floit bears the risk of non-persuasion. But this case was not a tossup as the bankruptcy judge saw things, so allocation of the burden was not dispositive. A solid demonstration that Huntley was worth more than $150,000 even if Floit was planning to leave would have gone a long way toward establishing that the bankruptcy judge made a clear error. Without such evidence it is awfully hard to say that the bankruptcy judge's findings are clearly erroneous.

According to the trustee, however, valuation is a matter of law rather than fact, and the trustee contends that under In re Prince, 85 F.3d 314 (7th Cir. 1996), corporate value includes the value of its entrepreneur's services. If that is so, then even a penny for Floit's covenant not to compete violates the duty he owed to the firm. But it is not so. Prince does not concern Illinois corporate law in general or 805 ILCS 5/8.60 in particular. It is instead an application of contract law to a bankruptcy case. Prince, an orthodontist, promised his creditors as part of an agreed plan of reorganization that he would turn over the value of his stock in his professional corporation. He agreed to sell that practice to a Dr. Clare for $450,000 but proposed to turn over only $7,500 to his creditors, claiming that the rest of the value was attributable to a no-competition agreement. One difficulty with this contention is that the $450,000 was the price set on "the practice"; unlike Harvard Ready Mix, Clare did not pay separately for physical assets and a covenant not to compete. What Prince had to sell was principally goodwill--that is, a client base, client records (exceptionally valuable in a dental practice), and a promise to continue working for six months to ensure that patients transferred their allegiance to Dr. Clare. Prince held that the agreement between Prince and his creditors included goodwill as part of the practice's value. We did not hold that for this

purpose "goodwill" included the value of Prince's personal services for the indefinite future. Our understanding of the bargain between Prince and his creditors does not imply that Huntley owned the value of Floit's services for the foreseeable future, despite the absence of an employment agreement between Huntley and Floit.

Doubtless Huntley owned its goodwill--its customer lists, the value of repeat business, and so on. See Hagshenas v. Gaylord, 199 Ill. App. 3d 60, 557 N.E.2d 316 (2d Dist. 1990). But the trustee does not accuse Floit of trying to make off with these assets, or of including their value in the $249,000 allocated to the covenant rather than the $151,000 allocated to assets. Even the trustee's expert conceded that Huntley's tangible assets were worth no more than $106,000; the rest was goodwill. Harvard did not assume Huntley's name, and cement usually is sold by competitive bid, so Huntley did not have the sort of goodwill that is associated with a personal-services business such as a medical practice. In the end, the trustee's position depends on allocating the value of Floit's human capital to Huntley, and we do not think that the bankruptcy judge committed clear error in ruling otherwise.

Affirmed